(648 P.2d 1156)
No. 53,391

STATE OF KANSAS, *Appellee,* v. MICHAEL ROBERT WILLIAMS, *Appellant.*

Opinion filed July 29, 1982.

*Edward W. Dosh,* of Parsons, for appellant.

*Charles S. Gray,* county attorney, and *Robert T. Stephan,* attorney general, for appellee.

Before SPENCER, P.J., ABBOTT and SWINEHART, JJ.

ABBOTT, J.: The defendant, Michael Robert Williams, appeals from a judgment of guilty for failing to present a current driver's daily log to a highway patrolman when requested to do so pursuant to K.S.A. 66-1,129 and K.A.R. 1980 Supp. 82-4-6.

The issue before us is whether a member of the highway patrol may stop a motor vehicle, which is subject to statutes, rules and regulations promulgated by the State of Kansas and its authorized agencies, to check the driver's daily log. Regulations require that a daily log be maintained in the truck cab and presented upon request to any law enforcement officer. K.A.R. 1980 Supp. 82-4-6(*c*)(1)(B), now K.A.R. 1981 Supp. 82-4-7a(*t*).

The defendant, while traveling on U.S. Highway 160 in Labette County, Kansas, during daylight hours, was stopped by a Kansas highway patrolman. The trooper requested defendant's daily log and defendant declined to present it because it was not properly filled out. Apparently the defendant had made no entries in the log since the preceding day. The trooper stopped the defendant solely to make an inspection to insure that the carrier, vehicle and driver were in compliance with Kansas Corporation Commission (KCC) regulations. The trooper had no reason to suspect that the carrier, driver or truck was not operating in

compliance with KCC regulations or was in violation of any law when he selected the truck at random to be checked.

The defendant was found guilty, fined $20 and ordered to pay $14.50 costs. This appeal followed.

We deem several cases of particular significance and will briefly review them in chronological order. The United States Supreme Court considered "licensing programs" requiring inspections in *Colonnade Corp. v. United States,* 397 U.S. 72, 25 L.Ed.2d 60, 90 S.Ct. 774 (1970). There, the Court stated that the liquor industry has traditionally been subject to close supervision and inspection, and that Congress has broad authority to fashion standards of reasonableness for search and seizure. The Court acknowledged that Congress has broad authority to design reasonable inspection powers as part of "licensing programs" involving licensed dealers in alcoholic beverages; however, when Congress authorizes inspections but makes no rules governing the procedure to follow, the Fourth Amendment standard of reasonableness applies. The Court concluded that since Congress made it an offense punishable by a $500 fine to refuse entry by inspectors to examine taxable items, Congress by implication denied authority for warrantless entries under the law being considered.

*Colonnade* was distinguished in *United States v. Biswell,* 406 U.S. 311, 32 L.Ed.2d 87, 92 S.Ct. 1593 (1972). In *Biswell,* the Supreme Court considered that part of the Gun Control Act of 1968 authorizing warrantless inspections of business premises in which federally licensed businesses sold firearms. The Court held that the seizure of the guns in question was not unreasonable, for if inspections authorized by the Gun Control Act are to be effective, they must of necessity be unannounced and frequent. The Court stated that such warrantless inspections pose only a limited threat to a dealer's expectation of privacy, because one who engages in that business knows it is "pervasively regulated." Apparently of equal importance is that every year a licensee is furnished copies of applicable rules and regulations which describe the licensee's obligations and define an inspector's authority. Thus, it is reasoned, the licensee knows the purpose of the inspection and its limits, thereby minimizing the possibility of abuse and the threat to privacy.

The Supreme Court considered in *United States v. Brignoni-Ponce,* 422 U.S. 873, 45 L.Ed.2d 607, 95 S.Ct. 2574 (1975), whether the Border Patrol has authority to stop automobiles in

areas near the Mexican border to question the occupants about their citizenship and immigration status. The Border Patrol had stopped an automobile solely because its three occupants appeared to be of Mexican descent. Two of the occupants were illegal immigrants. The driver was charged with knowingly transporting illegal immigrants. He moved to suppress the testimony of and about the two passengers, claiming such evidence was the fruit of an illegal seizure. His motion to suppress was denied and he was convicted. The Supreme Court stated:

"As with other categories of police action subject to Fourth Amendment constraints, the reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." 422 U.S. at 878.

The Court agreed there is a valid public interest in traffic-checking operations to reduce the flow of illegal aliens; but since substantially all of the traffic near our borders is lawful, it would be unreasonable to permit a Border Patrol officer who had no reasonable suspicion that an automobile contained illegal aliens, to arbitrarily stop any automobile on a random basis. The Court held that an officer must reasonably suspect a particular vehicle contains aliens who are illegally in the country to satisfy the "reasonableness" requirement of the Fourth Amendment.

In *United States v. Martinez-Fuerte,* 428 U.S. 543, 49 L.Ed.2d 1116, 96 S.Ct. 3074 (1976), the Supreme Court held that it was reasonable for Border Patrol agents to stop *all* traffic on a particular highway and then refer vehicles chosen at the agents' discretion to an area for additional inspection, even though one factor used in selecting vehicles for the secondary inspection was that a car contained persons who appeared to be of Mexican descent. The Court said the distinction between the "reasonableness" of the seizure in *Martinez-Fuerte* and the "unreasonableness" of the procedure in *Brignoni-Ponce* was:

"[The] objective intrusion—the stop itself, the questioning, and the visual inspection—also existed in roving-patrol stops. But we view checkpoint stops in a different light because the subjective intrusion—the generating of concern or even fright on the part of the lawful travelers—is appreciably less in the case of a checkpoint stop." 428 U.S. at 558.

Administrative inspections under the Occupational Safety and Health Act of 1970 were considered in *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 56 L.Ed.2d 305, 98 S.Ct. 1816 (1978). The Court

held the inspections were unreasonable because the scope and frequency of the inspections were not limited to the particular health and safety concerns regulated by the act, and the act provided no standards to guide the inspectors regarding who and when to search. The Court again limited its holding to the inspection provisions of OSHA and stated:

"The reasonableness of a warrantless search . . . will depend upon the specific enforcement needs and privacy guarantees of each statute. Some . . . statutes . . . apply only to a single industry, where regulations might already be so pervasive that a *Colonnade-Biswell* exception to the warrant requirement could apply." 436 U.S. at 321.

The question of whether a police officer can randomly stop an automobile solely to check the driver's license and the vehicle's registration was considered in *Delaware v. Prouse,* 440 U.S. 648, 59 L.Ed.2d 660, 99 S.Ct. 1391 (1979). The Supreme Court noted the police officer was not acting pursuant to any guidelines concerning spot checks promulgated by either his department or the State Attorney General. The Court specifically rejected the argument that the practice was necessary to promote public safety on the roads. In part, the Court reasoned that the random discretionary spot check of drivers' licenses is not a sufficiently productive mechanism to justify the intrusion upon a driver's Fourth Amendment interest which such stops entail, and that alternative mechanisms were available or could be adopted to meet the state's interests. The Court, relying on the justices' collective common sense as the source, stated that the percentage of unlicensed drivers on the road is small in comparison with licensed drivers, thus the possibility of discovering an unlicensed driver during a random spot check would not be sufficiently productive to qualify as a reasonable law enforcement practice under the Fourth Amendment.

As we view *Delaware v. Prouse,* the Supreme Court is saying that the officer must have an appropriate factual basis for the suspicion directed at a particular automobile *or,* where public interests otherwise justify a seizure, some other substantial and objective standard or rule must govern, at least to some extent, the exercise of discretion by the officer in the field. The Supreme Court in *Prouse* advised that states could develop spot checks that involve less intrusion *or* that do not involve the unconstrained exercise of discretion (such as questioning *all* oncoming traffic at

roadblock-type stops). Of particular interest and a cause for some concern to the question before us is footnote 26, which states:

"Nor does our holding today cast doubt on the permissibility of roadside truck weigh-stations and inspection checkpoints, at which some vehicles may be subject to further detention for safety and regulatory inspection than are others." 440 U.S. at 663.

The Supreme Court went on to limit its holding as follows:

"We hold *only* that persons in *automobiles* on public roadways may not for that reason alone have their travel and privacy interfered with at the unbridled discretion of police officers." 440 U.S. at 663 (emphasis supplied).

Finally, in *Donovan v. Dewey*, 452 U.S. 594, 69 L.Ed.2d 262, 101 S.Ct. 2534 (1981), warrantless searches of stone quarries as authorized by the Federal Mine Safety and Health Act of 1977 were considered against the reasonableness standard of the Fourth Amendment. The Court stated:

"[L]egislative schemes authorizing warrantless administrative searches of commercial property do not necessarily violate the Fourth Amendment. See, *e.g., United States v. Biswell,* 406 U.S. 311 (1972); *Colonnade Catering Corp. v. United States,* 397 U.S. 72 (1970). The greater latitude to conduct warrantless inspections of commercial property reflects the fact that the expectation of privacy that the owner of commercial property enjoys in such property differs significantly from the sanctity accorded an individual's home, and that this privacy interest may, in certain circumstances, be adequately protected by regulatory schemes authorizing warrantless inspections. *United States v. Biswell, supra,* at 316.

"The interest of the owner of commercial property is not one in being free from any inspections. Congress has broad authority to regulate commercial enterprises engaged in or affecting interstate commerce, and an inspection program may in some cases be a necessary component of federal regulation. Rather, the Fourth Amendment protects the interest of the owner of property in being free from *unreasonable* intrusions onto his property by agents of the government. Inspections of commercial property may be unreasonable if they are not authorized by law or are unnecessary for the furtherance of federal interests. *Colonnade Catering Corp. v. United States, supra,* at 77. Similarly, warrantless inspections of commercial property may be constitutionally objectionable if their occurrence *is* so random, infrequent, or unpredictable that the owner, for all practical purposes, has no real expectation that his property will from time to time be inspected by government officials. *Marshall v. Barlow's, Inc.,* [436 U.S.] at 323. 'Where Congress has authorized inspection but made no rules governing the procedures that inspectors must follow, the Fourth Amendment and its various restrictive rules apply.' *Colonnade Corp. v. United States, supra,* at 77. In such cases, a warrant may be necessary to protect the owner from the 'unbridled discretion [of] executive and administrative officers,' *Marshall v. Barlow's, Inc., supra,* at 323, by assuring him that 'reasonable legislative or administrative standards for conducting an . . . inspection are *satisfied with respect to a particular* [establish-

ment].' *Camara v. Municipal Court,* 387 U.S. 523, 538 (1967). [Emphasis original.]

"However, the assurance of regularity provided by a warrant may be unnecessary under certain inspection schemes. Thus, in *Colonnade Corp. v. United States,* we recognized that because the alcoholic beverage industry had long been 'subject to close supervision and inspection,' Congress enjoyed 'broad power to design such powers of inspection . . . as it deems necessary to meet the evils at hand.' 397 U.S., at 76-77. Similarly, in *United States v. Biswell,* this Court concluded that the Gun Control Act of 1968, 18 U.S.C. § 921 *et seq.,* provided a sufficiently comprehensive and predictable inspection scheme that the warrantless inspections mandated under the statute did not violate the Fourth Amendment. After describing the strong federal interest in conducting unannounced, warrantless inspections, we noted:

'It is also plain that inspections for compliance with the Gun Control Act pose only limited threats to the dealer's justifiable expectations of privacy. When a dealer chooses to engage in this pervasively regulated business . . . , he does so with the knowledge that his records, firearms, and ammunition will be subject to effective inspection. . . . The dealer is not left to wonder about the purposes of the inspector or the limits of his task.' 406 U.S., at 316.

These decisions make clear that a warrant may not be constitutionally required when Congress has reasonably determined that warrantless searches are necessary to further a regulatory scheme and the federal *regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes."* 452 U.S. at 598-600 (emphasis supplied).

The Court in *Donovan,* in upholding the constitutionality of the Federal Mine Safety and Health Act, likened mine and quarry inspections to the inspections considered in *Biswell,* 406 U.S. 311, concerning the Gun Control Act to the effect that unannounced inspections are necessary due to the ease with which violations could be concealed if advance notice is given. The Court concluded that it is the public interest sought to be protected and not the length of time the industry has been regulated that controls, and whether an inspection program is reasonable under the Fourth Amendment depends upon the pervasiveness and regularity of the regulation. The Federal Mine Safety and Health Act provides for the inspection of *all* mines and delineates the frequency of inspection; the standards with which the mine operator is required to comply are in writing, thus the operator knows the purpose and the limits of the inspection.

With the foregoing background, we turn to the case before us.

Motor carriers of passengers and property for hire in Kansas are pervasively regulated by the laws of Kansas. The legislature has attempted to insure coordination of efforts of the various state

agencies and departments having authority to adopt rules and regulations, and to see that the laws of this state regulating the motor carrier industry are enforced. K.S.A. 66-1302. At the time the offense occurred, K.A.R. 1980 Supp. 82-4-6 required covered drivers to make entries in a driver's log from which it could be determined whether the driver was putting in more hours on the job than were allowed by law. Drivers were further required to preserve and retain the log for a specified length of time and to present it for inspection when requested by an inspector or any other law enforcement officer.

K.S.A. 74-2108(*b*) provides:

"[M]embers of the Kansas highway patrol are hereby authorized and directed to execute and enforce the laws of this state relating to public and private motor carriers of passengers or property, including any rules and regulations of the state corporation commission relating thereto, and shall have the power and authority to require the driver of any motor vehicle owned or operated by any such carrier to stop and submit such vehicle to an inspection to determine compliance with such laws and rules and regulations."

The Kansas Highway Patrol is apparently the only law enforcement agency authorized to make random spot checks of vehicles which are subject to KCC regulations. (Any agent or employee of the revenue department or Kansas Corporation Commission is also authorized by K.S.A. 66-1319 and K.A.R. 1981 Supp. 82-4-2 to inspect such vehicles, but they are not specifically authorized to stop moving vehicles in order to do so.)

We are convinced that in Kansas, motor carriers of passengers and property for hire are pervasively regulated, and the public has substantial interests that are in need of protection. Trucks carrying large cargos present a substantial hazard if not operated in a safe condition or if operated by sleepy or ill drivers, and this is particularly so when transporting cargo such as nuclear material, explosives, petroleum products, chemicals and other hazardous materials. The potential for a catastrophe is much greater than that represented by passenger cars, and considerably more is at stake than if merely checking the license of an automobile driver.

Statistics taken from a report of the Legislative Division of Post Audit which assessed the effectiveness of the Kansas Motor Carrier Inspection System (Audit Report No. 78-PA5, March 1978) indicates that 15.4 percent of the trucks inspected by the Kansas Highway Patrol in calendar year 1977 were cited for

safety violations. The audit does not disclose why the trucks were chosen for inspection. We are thus unable to say what percentage was inspected as a result of random stops and what percentage was inspected because they were involved in an accident or were ticketed for a moving violation or some other infraction of the law. Citations were also given to 1.8 percent of all trucks inspected for being overweight. These figures become more meaningful when compared with figures compiled at permanent inspection stations operated at various hours. Those inspection stations issued 0.0 percent citations for safety violations and 0.3 percent citations for being overweight. The inescapable conclusion is that when an inspection point becomes known, a violation is corrected prior to the inspection *or* an alternate route is taken and the inspection station is simply bypassed.

At first glance, the language in *Prouse*, 440 U.S. 648, particularly footnote 26, appears to indicate the Court gave some consideration to truck traffic; however, as we view *Prouse,* its holding is specifically limited to automobiles. The footnote seems to permit inspection checkpoints where any type vehicle could be further detained in a manner similar to that authorized in *Martinez-Fuerte,* 428 U.S. 543, and no question exists as to the reasonableness of roadside truck weigh-stations where safety and regulatory inspections also are performed.

Are there reasonable alternatives to random spot checks, or can standards be devised that would eliminate discretion by the highway patrol officer in the field as to which truck to stop? We are unable to conceive of any viable alternative. Certainly a roadblock is permissible. Statistically, it does not appear to be effective. The reason seems obvious to us. Substantially all such vehicles are equipped with citizen's band radios (CB's). Before the wheels of the first truck approaching a temporary roadblock or an open permit-inspection station stop rolling, the airwaves are carrying the message of the exact location, and most drivers who believe themselves in violation have the option of taking an alternate route or simply stopping and waiting until the temporary roadblock is moved.

We equate the case before us to *United States v. Biswell,* 406 U.S. 311, where the Court concluded that if the inspections were to be effective they must of necessity be unannounced. The inspection authorized in *Biswell* was held to be a limited threat to

the dealer's expectation of privacy, because the industry was "pervasively regulated." Copies of the regulations were furnished to the dealer, who knew he was subject to such warrantless inspections. We have before us a factual situation in which a limited number of defined persons (members of the Kansas Highway Patrol) is authorized to make spot checks of pervasively regulated commercial businesses to insure compliance with regulations furnished to them by the state. The inspector's authority is limited to determining there is compliance with the law and the rules and regulations furnished to and known by the commercial business being inspected.

We thus conclude the warrantless search authorized by K.S.A. 74-2108($b$) for the purpose of inspecting any records or documents required to be maintained and kept in the truck cab, and to check for required safety equipment, is not unreasonable under the Fourth Amendment of the United States Constitution or Section 15 of the Bill of Rights of the Kansas Constitution.

Affirmed.