UNITED STATES of America,
Plaintiff–Appellant,

v.

Gregory Douglas SESLAR and
Meredit Tarcisio Mayorga,
Defendants–Appellees.

No. 92–3352.

United States Court of Appeals,
Tenth Circuit.

June 22, 1993.

Richard L. Hathaway (Lee Thompson, U.S. Atty., with him on the brief), Asst. U.S. Atty., Topeka, KS, for plaintiff-appellant.

Stephen W. Kessler and Marilyn M. Trubey, Topeka, KS, for defendants-appellees.

Before SEYMOUR, ANDERSON and TACHA, Circuit Judges.

TACHA, Circuit Judge.

The government appeals a district court order granting the defendants' motions to suppress physical evidence and oral statements as the fruit of an illegal stop of defendants' rental truck. We affirm.

## BACKGROUND

On February 7, 1992, at 9:10 a.m., Kansas Highway Patrol ("KHP") Trooper Dennis Gassman stopped a Ryder rental truck driven by defendant Gregory Seslar. Defendant Meredit Mayorga had rented the truck and was a passenger when it was stopped. Trooper Gassman stopped the truck to determine whether it was hauling a commercial load and, if so, whether the defendants possessed all permits required by the Kansas Corporation Commission. He conceded that he had no reason to believe that the truck was carrying a commercial load or that the defendants did not possess the proper permits.

Trooper Gassman examined the truck's rental papers, which showed that the truck had been rented in California for commercial purposes. After returning to his patrol car, he called in for a check on Mr. Seslar's driver's license. He also asked for a criminal history check because the defendants and the truck were from California, a drug source state. Transmission difficulties extended the time of these checks beyond the usual ten minutes.

While awaiting the results of the checks, Trooper Gassman began to fill out a truck inspection form. Seslar told him that Mr. Mayorga was moving to Atlanta, Georgia, and that the truck contained Mayorga's personal goods, including some furniture and some masonry sand. On the basis of this conversation, Trooper Gassman indicated on the inspection form that the load was non-commercial.

Because the rental papers stated that the load was commercial, Trooper Gassman directed the defendants to open the cargo area so that he could make sure that the load was not commercial. After Mayorga opened the cargo door, Trooper Gassman observed several items of furniture and some sealed boxes and determined that the load was not commercial. During this course of events, however, Mayorga told Trooper Gassman that he was moving his sister's belongings to Atlanta.

When Mayorga said this, Trooper Gassman saw Seslar open his eyes wide in surprise. After the door was closed again, Trooper Gassman told Seslar to return to the truck and took Mayorga to the patrol car to perform a driver's license and criminal history check.

At 9:36 a.m., KHP Trooper Michael Weigel arrived to meet Trooper Gassman on unrelated business. Trooper Gassman told Weigel that he was suspicious of the defendants because of their conflicting stories and Seslar's look of surprise, and because it was odd to transport sand across the country. Trooper Weigel asked Mayorga if the truck was carrying any drugs. After Mayorga answered no, Trooper Weigel asked for consent to search the truck for contraband. Mayorga responded, "Sure you can," and opened the cargo hold. Trooper Weigel noticed a strong smell of fabric softener and saw a small "baggie" of vegetation which appeared to be marijuana. He began opening some of the boxes and ultimately found approximately 248 pounds of marijuana. After arresting the defendants, the troopers read them their *Miranda* warnings. Seslar later made several incriminating statements.

The defendants sought to suppress the marijuana and Seslar's incriminating statements on the ground that they were obtained in violation of the Fourth Amendment. After hearing evidence and reviewing the parties' arguments, the district court agreed. The court held that the initial stop of the truck was unconstitutional under the rationale of *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), because it was not supported by a warrant, probable cause, or reasonable suspicion. The court rejected the government's argument that the search was a valid "regulatory search" under the Supreme Court's "closely regulated industry" line of cases, concluding that the Kansas statutes cited by the government did not sufficiently circumscribe Trooper Gassman's discretion. The court held further that, even if the stop were legal, the continued detention of the defendants after Troop-

er Gassman could have determined that no permit requirements had been violated was unconstitutional. Because the court concluded that the subsequent search and the resulting statements were tainted by either the illegal stop or the illegal continued detention, it granted the defendants' motions to suppress. The government appealed.

## DISCUSSION

█ The government makes three contentions on appeal: (1) the initial stop of the truck was constitutionally valid under Kansas statutes that authorize random stops of "motor carriers"; (2) the continued detention of the defendants until consent to search was obtained was valid because the troopers developed reasonable suspicion that criminal activity was afoot while performing the valid random stop; and (3) assuming that the stop and detention were lawful, the defendants have no standing to challenge the search of the truck. Because we conclude that the initial stop of the truck was unconstitutional, we affirm without addressing the last two arguments.

█ In general, there are three types of citizen-police encounters: (1) consensual encounters, which involve a citizen's voluntary cooperation with an official's non-coercive questioning and which are not seizures within the meaning of the Fourth Amendment; (2) investigative detentions or *"Terry* stops," which are seizures that are justified only if articulable facts and reasonable inferences drawn from those facts support a reasonable suspicion that a person has committed or is committing a crime; and (3) arrests, which are seizures characterized by highly intrusive or lengthy detention and which require probable cause to believe that the arrestee has committed or is committing a crime. *See United States v. Werking,* 915 F.2d 1404, 1407 (10th Cir.1990). In this case, the government concedes that the officers had neither consent, reasonable suspicion,[1] nor probable cause to stop the defendants' rental

---

1. The government's reliance on *Werking,* an earlier motor permit case, is thus misplaced. That case involved a *Terry* stop in which the government successfully argued that the officer reason-

ably suspected that the defendant was violating a law requiring a special permit for vehicles driven through the state for purpose of sale. *Id.* at 1407–08.

truck and, instead, invokes the doctrine governing a less common type of citizen-police encounter, the so-called "regulatory search."

■ A regulatory search is governed by the Fourth Amendment but does not require probable cause as defined traditionally by the courts. In general, probable cause, and the less stringent standard of reasonable suspicion, require *particularized* suspicion—that is, the officer must have some articulable basis to believe that the individual to be searched or seized has committed or is committing a crime. In contrast, a regulatory search is justified if the state's interest in ensuring that a *class* of regulated persons is obeying the law outweighs the intrusiveness of a program of searches or seizures of those persons. The origins of the regulatory search doctrine are traced to *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). The Supreme Court there held that, although health, safety, and fire inspectors could not insist on entering private homes without a search warrant, magistrates could issue warrants to conduct general area inspections without a showing of probable cause to believe that a violation had occurred in a particular building. *Id.* at 538, 87 S.Ct. at 1735–36. The Court emphasized that the warrant requirement eliminated the inspector's untrammeled discretion, *id.* at 532–33, 87 S.Ct. at 1732–33, and reasoned that the government's interest in conducting the inspections outweighed the relatively limited intrusion occasioned by such warrants, *id.* at 536–37, 87 S.Ct. at 1734–35.

■ Since *Camara*, the Supreme Court has expanded the reach of the regulatory search doctrine by permitting, in some circumstances, the *warrantless* searches of entities doing business in "closely regulated" industries. The Court recently summarized the closely regulated industry line of cases by articulating a three-part test for determining whether a warrant is required for a regulatory search:

First, there must be a "substantial" government interest that informs the regulatory scheme pursuant to which the inspection is made.

Second, the warrantless inspections must be "necessary to further [the] regulatory scheme." . . . .

Finally, "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant."

*New York v. Burger*, 482 U.S. 691, 702–03, 107 S.Ct. 2636, 2644, 96 L.Ed.2d 601 (1987) (quoting *Donovan v. Dewey*, 452 U.S. 594, 600, 602, 603, 101 S.Ct. 2534, 2540, 69 L.Ed.2d 262 (1981) (citations omitted); *see also S & S Pawn Shop, Inc. v. City of Del City*, 947 F.2d 432, 436 (10th Cir.1991); *V–1 Oil Co. v. Wyoming*, 902 F.2d 1482, 1485–86 (10th Cir.), *cert. denied*, 498 U.S. 920, 111 S.Ct. 295, 112 L.Ed.2d 249 (1990). To satisfy the third part of the test, the statute must perform two functions: (1) "it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope"; and (2) "it must limit the discretion of the inspecting officers." *Burger*, 482 U.S. at 703, 107 S.Ct. at 2644.

■ Before applying this test, however, the court must determine whether the industry involved is in fact a "closely regulated" one. *See id.* at 699–702, 107 S.Ct. at 2642–44. This initial determination is important because the justification for permitting warrantless searches is that persons doing business in closely regulated industries have a significantly reduced expectation of privacy. *See id.* at 702, 107 S.Ct. at 2643–44.

Invoking the closely regulated industry line of cases, the government argues that Trooper Gassman stopped the defendants' truck pursuant to a valid state regulatory scheme that permits warrantless spot checks of certain motor vehicles to determine whether they meet registration requirements. Section 66–1324 of the Kansas statutes requires unregistered "motor carriers" to stop at open inspection stations to submit to registration and inspection requirements. Kan. Stat.Ann. § 66–1324 (1992). It provides further that "[n]othing in this section shall be construed as prohibiting . . . any member of the state highway patrol from stopping any or all motor carriers, trucks or truck tractors

for the purpose of conducting spot checks to insure compliance with any state law relating to the regulation of motor carriers, trucks or truck tractors." *Id.* Section 74–2108(b) provides similar authority:

> [M]embers of the Kansas highway patrol are hereby authorized and directed to execute and enforce the laws of this state relating to public and private motor carriers of passengers or property, including any rules and regulations relating to such laws, and shall have the power and authority to require the driver of any motor vehicle owned or operated by any such carrier to stop and submit such vehicle to an inspection to determine compliance with such laws and rules and regulations.

*Id.* § 74–2108(b). The Kansas statutes define motor carriers as persons who use motor vehicles to transport persons or property for hire or to transport their own goods for commercial purposes.[2]

The government contends that the stop of the defendants' rental truck was permissible because these provisions authorize the random stop of *any* truck on the highway to check compliance with the regulatory scheme. Importantly, the government does not argue, and did not argue below, that the defendants belong to the regulated class of motor carriers. Because the government bears the ultimate burden of demonstrating the reasonableness of a warrantless seizure,

*see United States v. Ibarra,* 955 F.2d 1405, 1408 (10th Cir.1992), we assume that the defendants were not motor carriers and address only the government's argument that the provisions authorize Kansas officials to stop any truck, whether operated by a motor carrier or not, to first determine whether it is carrying a commercial load.

We conclude that the spot check provisions do not authorize the random stop of any truck traveling on the Kansas highways to first determine whether the truck is carrying a commercial load. Our conclusion follows from an important difference between the facts of this case and the facts of other closely regulated industry cases: in this case the defendants were not engaged in a regulated industry. The Supreme Court cases all involve defendants who were obviously engaged in the regulated industry. For example, in *Donovan v. Dewey,* the defendant was a mining company that operated a stone quarry that had been inspected at least once before. 452 U.S. at 597, 101 S.Ct. at 2537. In other cases it was similarly apparent that the defendants were part of the regulated industry. *See, e.g., Burger,* 482 U.S. at 691, 107 S.Ct. at 2636 (automobile junkyards); *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (firearms); *Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (alcoholic beverages).

---

2. Section 66–1,108 of the Kansas statutes provides the following specific definitions:

(a) The term "motor vehicle" when used in this act shall mean any automobile, truck, trailer, semitrailer, tractor, motor bus or any other self-propelled or motor driven vehicle used upon any of the public highways of the state for the purpose of transporting persons or property.

. . . .

(e) The term "public motor carrier of property" when used in this act shall mean any person who holds himself out to the public as willing to undertake for hire to transport by motor vehicle, from place to place, the property of others who may choose to employ him.

(f) The term "public motor carrier of passengers" when used in this act shall mean any person who holds himself out to the public as willing to undertake for hire to transport by motor vehicle, from place to place, persons who may choose to employ him.

(g) The term "contract motor carrier of property" when used in this act shall mean any

person engaged in the transportation by motor vehicle of property for hire and not included in the term "public motor carrier of property" as herein defined.

(h) The term "contract motor carrier of passengers" when used in this act shall mean any person engaged in the transportation by motor vehicle of persons for hire and not included in the term "public motor carrier of passengers" as hereinbefore defined.

(i) The term "private motor carrier of property" when used in this act shall mean any person engaged in the transportation, by motor vehicle, of property sold or to be sold by him in the furtherance of any commercial enterprise other than transportation, but not as a public motor carrier of property, or a contract motor carrier of property: *Provided,* That the term "private motor carrier of property" shall also include a person who transports the property of others by motor vehicle when such transportation is not for hire but is incident to or in furtherance of a commercial enterprise of such person other than transportation.

*Id.* 66–1,108(a), (c)-(i).

In this case the defendants were not motor carriers.[3] Instead, the defendants were driving a rental truck, which, like any other motor vehicle, could be used for commercial or personal purposes. Thus, these defendants did *not* have the reduced expectation of privacy of persons engaged in a closely regulated industry. *See Burger*, 482 U.S. at 702, 107 S.Ct. at 2643–44. As the Arkansas Supreme Court has reasoned, "[i]t would be a circumvention of the Fourth Amendment if the business exception to the probable cause or warrant requirement could be used wholly out of the context of its justification." *Dominguez v. State*, 290 Ark. 428, 720 S.W.2d 703, 707 (1986) (holding that a statute which arguably authorized random stops of motor carriers could not be read to authorize random stops of any motor vehicle merely to determine whether the detainees belonged to the regulated class).

Because the closely regulated industry line of cases does not justify the warrantless search of *un*regulated persons, we must analyze the government's claim under the more general balancing test applicable to warrantless investigatory stops. Under the Fourth Amendment, the reasonableness of a warrantless stop that is not supported by probable cause or reasonable suspicion depends on a balancing of the gravity of the public interest served by the seizure, the extent to which the seizure reasonably advances that interest, and the degree of intrusion on the detainee's liberty. *Brown v. Texas*, 443 U.S. 47, 50–51, 99 S.Ct. 2637, 2640–41, 61 L.Ed.2d 357 (1979); *see also Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 448–50, 455, 110 S.Ct. 2481, 2484–85, 8487, 110 L.Ed.2d 412 (1990). "A central concern in balancing these competing consid-

erations ... has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field." *Brown*, 443 U.S. at 51, 99 S.Ct. at 2640–41.

Under these standards, Trooper Gassman's conduct clearly violated the defendants' Fourth Amendment rights. Trooper Gassman randomly stopped the truck based solely on the possibility that the defendants might be violating the law. In *Delaware v. Prouse*, the Supreme Court held that police may not stop cars randomly to check whether the driver is licensed and the car registered. 440 U.S. at 663. The court reasoned that the lack of objective standards governing the police officer's decision of which cars to pull over gave the officer unchecked discretion. *Id.* at 662–63, 99 S.Ct. at 1400–01. Here, the government similarly fails to identify any meaningful standards or guidelines. Indeed, the thrust of the government's "closely regulated industry" argument is that the Kansas statutes authorized Trooper Gassman to stop *any* vehicle at *any* time. We therefore hold that the initial random stop of the defendants' rental truck was unconstitutional.[4] Because we further conclude that the subsequent search of the truck and Mr. Seslar's statements were tainted by the unconstitutional stop, we hold that the district court properly granted the defendants' motions to suppress. *See United States v. Erwin*, 875 F.2d 268, 269 n. 2 (10th Cir.1989).

**AFFIRMED.**

---

3. We do not address the reasoning of *State v. Williams*, 8 Kan.App.2d 14, 648 P.2d 1156 (1982), in which the Court of Appeals of Kansas found the practice of randomly stopping *motor carriers* pursuant to § 74–2108(b) constitutional under the rationale of the closely regulated industry line of cases. For purposes of this case, we assume, without holding, that Kansas closely regulates the motor carrier industry and that the Kansas regulatory scheme satisfies the *Burger* test because the scheme is informed by a substantial government interest, because warrantless random stops are necessary to further the scheme, and because the scheme provides an adequate substitute for a warrant.

4. We acknowledge the government's argument that random stops such as this one are necessary to prevent motor carriers from skirting the regulations by concealing their motor carrier status and then avoiding fixed checkpoints. We do not decide whether or how Kansas officials could stop vehicles to determine if they were concealed motor carriers, however, because the complete absence of meaningful discretion-limiting standards in this case obviates the need to consider all the Fourth Amendment balancing factors.