No. 83,574

STATE OF KANSAS, *Appellee,* v. ROBERT LEE CRUM, *Appellant.*
(19 P.3d 172)

Opinion filed March 16, 2001.

*John Jenab,* of Jenab & Kuchar, argued the cause, and *Alice A. Craig,* of the same firm, was on the brief for appellant.

*Lee J. Davidson,* deputy county attorney, argued the cause, and *Carla J. Stovall,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: This is Robert Lee Crum's direct appeal of his conviction of driving as a habitual violator, K.S.A. 1998 Supp. 8-287, a severity level 9 nonperson felony.

Crum contends that the random stop of his commercial vehicle violates the Fourth Amendment to the United States Constitution and there was insufficient evidence to establish that he had been notified of his status as a habitual violator.

Our jurisdiction is under K.S.A. 20-3018(c) (transfer on our own motion).

While the legal effect is contested, the facts are not in dispute.

Kansas Highway Patrol Motor Carrier Inspector Alan Boyle, while on patrol on U.S. Highway 81, near South Haven, Kansas, stopped a truck hauling an empty auto trailer. Inspector Boyle noticed the truck had a logo on the cab and Kansas apportioned license plates. He testified he was absolutely certain he was dealing with a commercial motor carrier.

Inspector Boyle did not observe any traffic infractions, nor did he have any particularized suspicion that the driver was committing any crimes. He activated his emergency lights and stopped the truck solely to determine if the truck and driver complied with the state and federal rules and regulations applicable to motor carriers.

Inspector Boyle requested the driver's log and permits. The driver did not have a log book but stated he had delivered a load of cars to Oklahoma City and was returning to Valley Center. The driver provided all other necessary permits. When Inspector Boyle asked for the driver's license, the driver responded, "I'll just tell you right now. It's suspended." The driver was identified as Robert Lee Crum.

Inspector Boyle ran Crum's information through the dispatcher and learned that his driving privileges were revoked as a habitual violator. Inspector Boyle then arrested Crum and charged him with driving while his license was revoked as a habitual violator.

Prior to a preliminary hearing, Crum moved to suppress evidence, claiming the stop of his vehicle was invalid. After an evidentiary hearing, the court overruled the motion to suppress.

When the matter came for trial, the State asked the court to consider Inspector Boyle's testimony given during the motion to suppress, as well as a certified copy of Crum's driving record that showed his K.S.A. 1998 Supp. 8-286 habitual violator notice. Crum objected based upon the arguments presented in his motion to suppress evidence. The court allowed the evidence and found Crum guilty of the offense of driving while his license was revoked as a habitual violator.

Subsequently, after determining Crum's criminal history to be category F, the court sentenced him to 9 months in the custody of the Secretary of the Department of Corrections and placed him on probation for a period of 24 months. As a condition of probation, Crum was ordered to serve 10 days in the county jail. Crum appeals.

We first consider whether the random stops of commercial vehicles violates the Fourth Amendment to the United States Constitution. Our scope of review was set forth in *State v. Toothman*, 267 Kan. 412, 416, 985 P.2d 701 (1999), where we stated:

"An appellate court reviews the factual underpinnings of a district court's decision 'by a substantial competent evidence standard and the ultimate legal conclusion drawn from those facts by a de novo standard. An appellate court does not reweigh the evidence. The ultimate determination of the suppression of evidence is a legal question requiring independent appellate review.' "

The specific wording of K.S.A. 74-2108, which is challenged herein, states:

"(a) The superintendent and members of the Kansas highway patrol are hereby vested with the power and authority of peace, police and law enforcement officers anywhere within this state irrespective of county lines.

"(b) In addition to the general power and authority prescribed by subsection (a), the superintendent and members of the Kansas highway patrol are hereby authorized and directed to execute and enforce the laws of this state relating to public and private motor carriers of passengers or property, including any rules and regulations relating to such laws, and shall have the power and authority to require the driver of any motor vehicle owned or operated by any such carrier to stop and submit such vehicle to an inspection to determine compliance with such laws and rules and regulations."

The precise question presented to us was before the Kansas Court of Appeals in *State v. Williams*, 8 Kan. App. 2d 14, Syl., 648 P.2d 1156, *rev. denied* 231 Kan. 802 (1982), which held:

"A warrantless inspection of a motor vehicle authorized to transport property for hire and subject to regulations of the State of Kansas, which was stopped by an officer of the Kansas Highway patrol solely to conduct an inspection pursuant to K.S.A. 74-2108(*b*) without any suspicion on the part of the officer that there was a violation of any laws of the State of Kansas, does not violate either the Fourth Amendment to the United States Constitution or Section 15 of the Bill of Rights of the Kansas Constitution."

The *Williams* decision, which is not factually distinguishable from our facts, was later relied on by our court in *State v. Moore*, 237 Kan. 523, 528, 701 P.2d 684 (1985), as authority for the Kansas Department of Revenue to stop motor carriers or trucks for the purpose of conducting spot checks to determine compliance with statutory vehicle weight limitations.

Crum's argument is that although Kansas has previously allowed random stops of commercial motor carriers, our law is now unconstitutional under the test announced in *New York v. Burger*, 482 U.S. 691, 96 L. Ed. 2d 601, 107 S. Ct. 2636 (1987), a case decided subsequent to *Williams* and *Moore*.

In an analysis closely mirroring that of *Williams*, the United States Supreme Court in *Burger* considered whether a statute authorizing random searches of New York automobile junkyards was violative of the Fourth Amendment. In upholding the constitutionality of the statute, the Court pronounced the following test:

"This warrantless inspection, however, even in the context of a pervasively regulated business, will be deemed to be reasonable only so long as three criteria are met. First, there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made. [Citations omitted.]

"Second, the warrantless inspections must be 'necessary to further [the] regulatory scheme.' . . .

"Finally, 'the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant.' . . . In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers. [Citations omitted.] To perform this first function the statute must be 'sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that this property will be subject to periodic inspections undertaken for specific purposes.' [Citation omitted.] In addition, in defining how a statute limits the discretion of the inspectors, we have observed that it must be '*carefully limited in time, place, and scope.*' [Citation omitted.]" (Emphasis added.) 482 U.S. at 702-03.

Crum conceded at the suppression hearing and on appeal that the current Kansas statute met all the elements of the *Burger* test except for the requirement that the inspection be "carefully limited in time, place, and scope." Crum argues that he is only challenging

random stops without any probable cause or reasonable articulable suspicion.

The State concedes that Inspector Boyle did not have any reasonable suspicion of any law violation when he stopped Crum's motor vehicle. Crum was stopped and asked for his driver's log and driver's license, and the search was in no matter invasive. Because Crum has conceded all elements of the constitutionality of K.S.A. 74-2108(b), save one, only that issue is properly before the court.

In *Burger*, the Supreme Court made the following analysis of the New York automobile junkyard law, specifically concerning the "time, place, and scope" limitations:

"Finally, the 'time, place, and scope, of the inspection is limited, *United States v Biswell*, 406 U.S. [311], at 315, [32 L. Ed. 2d 87, 92 S. Ct. 1593 (1972)] to place appropriate restraints upon the discretion of the inspecting officers. See *Donovan v. Dewey*, 452 U.S. [594], at 605 [, 69 L. Ed. 2d 262, 101 S. Ct. 2534 (1981)]. The officers are allowed to conduct an inspection only 'during [the] regular and usual business hours.' § 415-a5. The inspection can be made only of vehicle-dismantling and related industries. And the permissible scope of these searches is narrowly defined: the inspectors may examine the records, as well as 'any vehicles or parts of vehicles which are subject to the record keeping requirement of this section and which are on the premises.' [Citation omitted.]" 482 U.S. at 711-12.

Crum's argument that because K.S.A. 74-2108(b) allows stops of commercial vehicles at any time, at any place, and under any circumstances could easily become unconstitutionally invasive, while not shown factually in our case, was discussed in footnotes 21 and 22 of the *Burger* opinion as follows:

"Respondent contends that § 415-a5 is unconstitutional because it fails to limit the number of searches that may be conducted of a particular business during any given period. Brief for Respondent 12. While such limitations, or the absence thereof, are a factor in an analysis of the adequacy of a particular statute, they are not determinative of the result so long as the statute, as a whole, places adequate limits upon the discretion of the inspecting officers. Indeed, we have approved statutes authorizing warrantless inspections even when such statutes did not establish a fixed number of inspections for a particular time period. See *United States v. Biswell*, 406 U.S. 311, 312 n.1 (1972). And we have suggested that, in some situations, inspections must be conducted frequently to achieve the purposes of the statutory scheme. *Id.*, at 316. ('Here, if inspection is to be effective and

serve as a credible deterrent, unannounced, even *frequent*, inspections are essential') (emphasis added)." 482 U.S. at 711 n.21.

"With respect to the adequacy of the statutory procedures, this case is indistinguishable from *United States v. Biswell*. There, the regulatory provisions of the Gun Control Act permitted warrantless inspections of both records and inventory 'at all reasonable times.' *Id.*, at 312, n.1. The Court held that the statute gave a firearms dealer adequate notice of 'the purposes of the inspector [and] the limits of his task.' *Id.*, at 316." 482 U.S. at 712 n.22.

The *Burger* opinion and Judge, now Justice, Abbott's opinion in *Williams* both relied on *United States v. Biswell*, 406 U.S. 311, 32 L. Ed. 2d 87, 92 S. Ct. 1593 (1972), in applying the time, place, and scope limitations. The *Williams* opinion stated:

"We equate the case before us to *United States v. Biswell* [citation omitted], where the Court concluded that if the inspections were to be effective they must of necessity be unannounced. The inspection authorized in *Biswell* was held to be a limited threat to the dealer's expectation of privacy, because the industry was 'pervasively regulated.'. . . We have before us a factual situation in which a limited number of defined persons (members of the Kansas Highway Patrol) is authorized to make spot checks of pervasively regulated commercial businesses to insure compliance with regulations furnished to them by the state. The inspector's authority is limited to determining [whether] there is compliance with the law and the rules and regulations furnished to and known by the commercial business being inspected." *Williams*, 8 Kan. App. 2d at 21-22.

In applying the *Burger* factors to our Kansas statutes, it is clear that in order to be effective the Kansas Highway Patrol must have the ability to make stops "at all reasonable times." Since commercial trucking occurs on a 24-hour basis, K.S.A. 74-2108(b) is entirely reasonable in not limiting when a commercial vehicle could be stopped. In the *Biswell* case, the Court stated: "[I]f inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential." 406 U.S. at 316.

Crum argues that a driver could be unlawfully harassed because the number of stops are not limited. There is no evidence of improper acts here and, in fact, the stop in issue was totally and completely random. While the lack of a stated limitation may be a factor in the analysis of a particular statute, this will not be determinative as long as adequate limits on the discretion of the inspection officers exist. *Burger*, 482 U.S. at 711 n. 21. The fact that

a statute fails to specify the frequency of permissible stops is not in and of itself constitutional error. The *Williams* opinion looked to the alternatives to random stops in the following manner:

"Are there reasonable alternatives to random spot checks, or can standards be devised that would eliminate discretion by the highway patrol officer in the field as to which truck to stop? *We are unable to conceive of any viable alternative.* Certainly a roadblock is permissible. Statistically, it does not appear to be effective. The reason seems obvious to us. Substantially all such vehicles are equipped with citizen's band radios (CB's). Before the wheels of the first truck approaching a temporary roadblock or an open permit-inspection station stop rolling, the airwaves are carrying the message of the exact location, and most drivers who believe themselves in violation have the option of taking an alternate route or simply stopping and waiting until the temporary roadblock is moved." (Emphasis added.) 8 Kan. App. 2d at 21.

The *Williams* opinion also cited to a statistical study done by the Legislative Division of Post Audit. The study showed that 15.4% of trucks inspected were found to have safety violations and 1.8% were overweight. In contrast, the permanent inspection stations operated at various hours cited 0.0% of the trucks for safety violations and 0.3% for being overweight. As the Court of Appeals noted: "The inescapable conclusion is that when an inspection point becomes known, a violation is corrected prior to the inspection or an alternate route is taken and the inspection station is simply bypassed." 8 Kan. App. 2d at 21.

When compared with the regulations of New York auto junkyards involved in *Burger,* the Kansas statutes and regulatory scheme passes constitutional muster as to scope. The scope of the search is limited to "an inspection to determine compliance with such laws and rules and regulations." K.S.A. 74-2108(b). The laws, rules, and regulations referred to are those "relating to public and private motor carriers of passengers or property." Laws relating to motor carriers are located at K.S.A. 66-1,105 *et seq.*, and regulations are found at K.A.R. 82-4-1 *et seq.* A driver of a motor carrier is on notice by statute that an officer may stop him or her for an inspection, but that inspection is limited to determining whether the driver and vehicle are in compliance with applicable motor carrier laws, rules, and regulations. The permissible scope of the searches is narrowly defined and clearly constitutional.

As to the limitation on place, the area involved is the highways and trafficways of the state of Kansas. There is clearly a sufficient public interest in safety to find the place of stops is sufficiently and constitutionally limited.

The Kansas cases of *Williams* and *Moore* were relied upon by the Iowa Supreme Court in *State v. A-1 Disposal,* 415 N.W.2d 595 (Iowa 1987), in an opinion that also contained a *Burger* analysis. As to the particular issue raised herein, the opinion stated:

"While the 'commercial premises' in this case is mobile and we address the question of a vehicle stop rather than warrantless searches, the reasoning of *Burger* is closely analogous here. We have already explained the important governmental interest in regulating commercial vehicles and the need for temporary checkpoints in furthering the regulatory scheme of Iowa Code section 321.463, satisfying the first two criteria of *Burger*. Satisfying the third criterion, Iowa Code sections 321.476 and 321.477 inform commercial haulers that they are subject to frequent inspections and by whom. Thus, the commercial haulers know that 'the inspections to which he is subject do not constitute discretionary acts by a government official but are conducted pursuant to statute.' [Citation omitted.] . . . Additionally, the place (on the highways) and the scope of the inspections are explicitly limited as we have already pointed out. Given the criteria outlined in *Burger*, the stops in this case without reasonable cause were not unreasonable under the fourth amendment." 415 N.W.2d at 600.

We hold, as we did in *Williams* and *Moore,* that K.S.A. 74-2108(b) is and remains constitutional under the Fourth Amendment and clearly passes the *Burger* analysis.

Crum also contends that Inspector Boyle did not have a sufficient basis to believe that Crum was subject to a regulatory stop. The testimony is uncontroverted that Boyle knew he was dealing with a commercial vehicle. This contention was not argued below and will not be considered on appeal. *State v. Smith,* 268 Kan. 222, 242-43, 993 P.2d 1213 (1999).

Additionally, Crum's attempt to rely on *U.S. v. Seslar,* 996 F.2d 1058 (10th Cir. 1993), is misplaced. In *Seslar,* the stop was of a Ryder rental truck, which was used for private purposes. In our case, the inspector knew the truck was a commercial motor carrier prior to the stop. *Seslar* is not applicable to our case.

Crum also raises a sufficiency of evidence issue contending the State failed to prove adequate notice to convict him of driving while his license was revoked as a habitual violator.

" 'When the sufficiency of the evidence is challenged [in a criminal case], the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.' [Citation omitted]" *State v. Mason*, 268 Kan. 37, 39, 986 P.2d 387 (1999).

The trial court admitted into evidence a certified copy of Crum's driving record which included a letter dated May 19, 1997, headed:

"DRIVERS LICENSE WITHDRAWAL NOTICE
"HABITUAL VIOLATOR (K.S.A. 8-286)."

The letter showed a withdrawal period from 05/19/1997 to 05/19/2000. Also included was a certificate of mailing dated May 19, 1997, showing the notice had been mailed to Robert Lee Crum, with him home address in Wichita and his driver's license number.

In addition, Crum did not contend before the district court that he had not received notices from the Kansas Department of Revenue or that he had no knowledge of his status as a habitual violator. In fact, when asked by Inspector Boyle for his driver's license, he said, "I'll just tell you right now. It's suspended."

Crum now contends that admitting to knowing his driver's license was suspended is totally different from acknowledging he was driving while he knew had been designated as a habitual violator. This may be true, but the record also clearly shows the Kansas Department of Revenue mailed to Crum, at his last known post office address, notice that he had been designated as a habitual violator.

Crum's reliance on *State v. Lewis*, 263 Kan. 843, 953 P.2d 1016 (1998), is misplaced. We stated therein: "[I]n prosecutions under K.S.A. 1996 Supp. 8-287, the finder of fact may, but is not required to infer knowledge of status from the fact that notification of the accused's status as a habitual violator was mailed to the accused at the accused's last known official address. [Citation omitted.]" 263 Kan. at 858-59. The evidence in our case of the notification and the mailing clearly satisfied this requirement, and the trial court had sufficient competent evidence of all of the elements of the crime charged. This contention is without merit.

Crum's conviction is affirmed.