UNITED STATES of America, Plaintiff,

v.

Gerald G. BURCH, and Gale F. Burch, Defendants.

No. 95–40045–01–02–SAC.

United States District Court, D. Kansas.

Oct. 6, 1995.

Steven E. Emke, Grounds, Rose & Emke, Kansas City, MO, Gordon Harness, Okla-

homa City, OK, Gary Hill, El Paso, TX, for Gerald G. Burch.

Gerald G. Burch, pro se.

Marilyn M. Trubey, Office of Federal Public Defender, Topeka, KS, for Gale F. Burch.

Gale F. Burch, pro se.

Thomas G. Luedke, Office of United States Attorney, Topeka, KS, for the U.S.

## MEMORANDUM AND ORDER

CROW, District Judge.

On June 13, 1995, the grand jury returned a two count indictment charging Gerald G. Burch and Gale F. Burch, apparently husband and wife, with conspiracy to possess with intent to distribute 538 pounds of marijuana (Count 1) and possession with intent to distribute 538 pounds of marijuana (Count 2). The marijuana was discovered during a stop of the semi-tractor/trailer rig driven by Gerald Burch; Gale Burch was riding as a passenger.

This case comes before the court upon the following pretrial motions: [1]

**Motion filed by Gerald G. Burch (represented by Gary Hill):**

1. **Motion to Suppress Evidence (Dk. 39).**

**Motions by Gale F. Burch (represented by Marilyn Trubey):**

1. **Motion for disclosure [of Rule 404(b) Evidence] (Dk. 32).**

2. **Motion to Suppress Evidence (Dk. 31).**

3. **Motion to Suppress Statement (Dk. 33).**

The government has filed responses to each of the defendant's motions (Dk. 35 and Dk. 44).

On September 11, 1995, the court conducted a hearing on the defendants' motions and took the matter under advisement. The defendants were afforded an opportunity to file an additional brief addressing the issues raised in their motion to suppress, and Gerald Burch availed himself of that opportunity. The court, having considered the evidence presented, the briefs and arguments of counsel, and the applicable law, is now prepared to rule.

**Motion for disclosure [of Rule 404(b) Evidence] (Dk. 32).**

Gale Burch seeks an order directing the government to disclose any evidence it intends to introduce at trial pursuant to Fed. R.Evid. 404(b). The government responds, indicating that does not have any Rule 404(b) evidence that it plans to introduce at trial.

Gale Burch's motion is denied as moot.

**Motions to Suppress Evidence (Dk. 31 and Dk. 39).**

Both Gale and Gerald Burch seek an order suppressing evidence seized from the truck. Consolidated, these are the arguments advanced by the defendants:

1. The stopping of the vehicle based upon a random "spot check" was not authorized by the Kansas statute and was therefor illegal.

2. Even if the initial stop was legal, the subsequent questions exceeded the scope of the stop's underlying justification/unlawful detention.

3. If consent to search was given, such consent was not voluntary.[2]

## Summary of Facts

On June 4, 1995, at approximately 2:19 p.m., Kansas Highway Patrol Trooper B.K. Smith, while on routine patrol, stopped a semi-tractor and trailer driven by Gerald Burch. Gale Burch was riding as a passenger. Trooper Smith stopped the vehicle for an inspection pursuant to his authority under

---

1. On June 29, 1995, the court conducted a phone conference to consider the defendants' motions to preserve dispatch tapes (Dk. 12; Dk. 15). The defendants' motions were granted in part and denied in part. The government agreed to review the tape for exculpatory or impeaching material. On July 19, 1995, the court received a letter from Tom Luedke, Assistant United States Attorney, informing both the court and the defendants that he had reviewed the dispatch tape and found no information of an impeaching or exculpatory nature.

2. In light of the court's ruling, it is unnecessary to address this issue.

the laws and regulations of the State of Kansas and the Kansas Corporation Commission. Trooper Smith' stopped the truck for a routine truck inspection of equipment, permits and driver record of duty status. Trooper Smith typically stops several commercial trucks at random each month to perform such inspections.

During the safety inspection, Trooper Smith asked Gerald Burch if he had a letter permitting him to carry a passenger with him. Gerald Burch indicated that he did not think that such a requirement applied as Gale Burch was part owner.

Although Trooper Smith's exterior inspection of the truck and trailer revealed no safety violations, Trooper Smith became increasingly suspicious. The bill of lading was hand written. Although the cargo was generally described, the weight of the freight was not indicated. Trooper Smith noticed that the shipping charge for the items was only $337, an amount he believed to be too low to pay for a trip from Dallas, Texas, to Chicago, Illinois.

After completing his inspection of the exterior of the vehicle and the documents, Trooper Smith gave Gerald Burch a "Kansas Highway Patrol Truck Inspection Report," which indicated no safety infractions and no hazardous materials were being transported. Gale Burch argues that instead of simply releasing him as he should have done, Trooper Smith instead required him to open the trailer for inspection. Trooper Smith testified that although he had given Gerald Burch a copy of the Kansas Highway Patrol Truck Inspection Report, his examination of the vehicle was not complete until he checked the cargo in the trailer and whether it was safely secured. When the door to the trailer was opened, Trooper Smith could see very little cargo in the large trailer. In addition, Trooper Smith was assailed with the odor of marijuana and mothballs. A subsequent test of the substances found in the trailer indicated that the boxes contained 538 pounds of marijuana.

Trooper Smith placed Gerald Burch under arrest. Retrieving his shotgun from his vehicle, Trooper Smith proceeded to the cab of the vehicle and placed Gale Burch under arrest at approximately 2:35. Gale Burch was advised of her rights. The Burches were taken to Lyndon, Kansas at approximately 4:00 p.m.

Trooper Haak, the Kansas Highway Patrol liaison working with the Drug Enforcement Administration, was contacted. Trooper Haak traveled to Lyndon in an attempt to interview the Burches and arrange a controlled delivery of the marijuana. Trooper Haak first interviewed Gerald Burch. Trooper Haak subsequently interviewed Gale Burch. Prior to interviewing Gale Burch, Trooper Haak advised her of her rights. At that time, Gale Burch indicated that she did not want to speak to Trooper Haak. Trooper Haak then terminated the interview.

Gale Burch, apparently after talking with her husband, changed her mind and indicated that she wished to talk with Trooper Haak. Gale Burch then provided information regarding the receipt and delivery of the marijuana. The hour-long interview concluded with the understanding that Gale Burch would cooperate in making a controlled delivery of the marijuana in Chicago, Illinois.

Trooper Haak then proceeded to make arrangements for the controlled delivery. However, the process of making the necessary arrangements was not instantaneous and required the better part of a day to consummate. When Trooper Haak returned to make the final arrangements with the Burches for the controlled delivery, Gale Burch asked Trooper Haak if she would be placed in jail in Chicago after the controlled delivery. Trooper Haak indicated that it was possible she would spend some time incarcerated. At that point, Gale Burch, apparently frustrated with the arrangement, refused to cooperate further. On June 7, 1995, Gale Burch was taken before a magistrate.

### Standing

As an initial issue, the government challenges Gale Burch's standing to object to the search of the trailer. Because Gale Burch was merely a passenger and did not have a possessory interest in the trailer, the government argues that she cannot challenge the lawfulness of the search of the trailer. Gale Burch's brief does not address this issue, but

is apparently premised on the assumption that she does have standing.

■ The government correctly argues that a passenger lacks standing to challenge the legality of the search of a vehicle she does not own, have lawful possession or lawful control. *See United States v. Kopp,* 45 F.3d 1450, 1452–1453 (10th Cir.) (defendant did not have privacy interest in U–Haul trailer he did not own, lease or control access), *cert. denied,* — U.S. ——, 115 S.Ct. 1721, 131 L.Ed.2d 579 (1995); *United States v. Lewis,* 24 F.3d 79, 81 (10th Cir.), *cert. denied,* — U.S. ——, 115 S.Ct. 271, 130 L.Ed.2d 189 (1994); *United States v. Abreu,* 935 F.2d 1130 (10th Cir.) (defendant has no privacy interest in trailer attached to tractor defendant owned), *cert. denied,* 502 U.S. 897, 112 S.Ct. 271, 116 L.Ed.2d 224 (1991). However, the Burches are apparently residents of Texas. Under Texas law, *see* Tex.Fam.Code Ann. § 5.02 (West 1995) ("Property possessed by either spouse during or on dissolution of marriage is presumed to be **community** property."), Gale Burch is presumed to be a coowner of the truck and therefore, based upon the evidence presented, she apparently has standing to contest the stopping of the truck.[3]

## Legal Standards

In *United States v. Seslar,* 996 F.2d 1058 (10th Cir.1993),[4] the Tenth Circuit addressed issues similar to those presented by this case.

In general, there are three types of citizen-police encounters: (1) consensual encounters, which involve a citizen's voluntary cooperation with an official's non-coercive questioning and which are not seizures within the meaning of the Fourth Amendment; (2) investigative detentions or "Terry stops," which are seizures that are justi-

fied only if articulable facts and reasonable inferences drawn from those facts support a reasonable suspicion that a person has committed or is committing a crime; and (3) arrests, which are seizures characterized by highly intrusive or lengthy detention and which require probable cause to believe that the arrestee has committed or is committing a crime.

996 F.2d at 1060. A less common type of citizen-police encounter is the so-called "regulatory search."

A regulatory search is governed by the Fourth Amendment but does not require probable cause as defined traditionally by the courts. In general, probable cause, and the less stringent standard of reasonable suspicion, require particularized suspicion—that is, the officer must have some articulable basis to believe that the individual to be searched or seized has committed or is committing a crime. In contrast, a regulatory search is justified if the state's interest in ensuring that a class of regulated persons is obeying the law outweighs the intrusiveness of a program of searches or seizures of those persons. The origins of the regulatory search doctrine are traced to *Camara v. Municipal Court,* 387 U.S. 523, 18 L.Ed.2d 930, 87 S.Ct. 1727 (1967). The Supreme Court there held that, although health, safety, and fire inspectors could not insist on entering private homes without a search warrant, magistrates could issue warrants to conduct general area inspections without a showing of probable cause to believe that a violation had occurred in a particular building. *Id.* at 538, 87 S.Ct. at 1735–36. The Court emphasized that the warrant requirement eliminated the inspector's untrammeled discretion, *id.* at 532–33, 87 S.Ct. at 1732–33, and reasoned that the government's

---

**3.** To the extent that Gale Burch challenges the lawfulness of her own detention, she would of course have standing. *See Kopp,* 45 F.3d at 1453 ("Defendant, as owner and driver of the pickup truck, unquestionably has standing to contest the stop of the truck and the continued detention of the truck and of his person.").

**4.** In *Seslar,* the Tenth Circuit affirmed Judge Rogers' decision granting the defendants' motions to suppress the fruits of a stop of their rented Ryder truck. Judge Rogers held, *inter*

*alia,* that the initial stop of the rented truck was unconstitutional as it was not supported by probable cause or reasonable suspicion. Nor was the stop of the truck justified under the "regulatory search" exception. The Tenth Circuit agreed: "We conclude that the spot check provisions do not authorize the random stop of any truck traveling on the Kansas highways to first determine whether the truck is carrying a commercial load." 996 F.2d at 1062.

interest in conducting the inspections outweighed the relatively limited intrusion occasioned by such warrants, *id.* at 536–37, 87 S.Ct. at 1734–35.

Since *Camara*, the Supreme Court has expanded the reach of the regulatory search doctrine by permitting, in some circumstances, the warrantless searches of entities doing business in "closely regulated" industries. The Court recently summarized the closely regulated industry line of cases by articulating a three-part test for determining whether a warrant is required for a regulatory search:

> First, there must be a "substantial" government interest that informs the regulatory scheme pursuant to which the inspection is made.

> Second, the warrantless inspections must be "necessary to further [the] regulatory scheme." ....

> Finally, "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provide a constitutionally adequate substitute for a warrant."

*New York v. Burger,* 482 U.S. 691, 702–03, 96 L.Ed.2d 601, 107 S.Ct. 2636, 2643–44 (1987) (quoting *Donovan v. Dewey,* 452 U.S. 594, 600, 602, 603, 69 L.Ed.2d 262, 101 S.Ct. 2534, 2538–39, 2540 (1981) (citations omitted)); *see also S & S Pawn Shop, Inc. v. City of Del City,* 947 F.2d 432, 436 (10th Cir.1991); *V–1 Oil Co. v. Wyoming,* 902 F.2d 1482, 1485–86 (10th Cir.), *cert. denied,* 498 U.S. 920, 112 L.Ed.2d 249, 111 S.Ct. 295 (1990). To satisfy the third part of the test, the statute must perform two functions: (1) "it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope"; and (2) "it must limit the discretion of the inspecting officers." *Burger,* 482 U.S. at 703, 107 S.Ct. at 2644.

Before applying this test, however, the court must determine whether the industry involved is in fact a "closely regulated" one. *See id.* at 699–702, 107 S.Ct. at 2642–44. This initial determination is important because the justification for permitting warrantless searches is that persons doing business in closely regulated industries have a significantly reduced expectation of privacy. *See id.* at 702, 107 S.Ct. at 2643–44.

Section 66–1324 of the Kansas statutes requires unregistered "motor carriers" to stop at open inspection stations to submit to registration and inspection requirements. Kan.Stat.Ann. 66–1324 (1992). It provides further that "nothing in this section shall be construed as prohibiting ... any member of the state highway patrol from stopping any or all motor carriers, trucks or truck tractors for the purpose of conducting spot checks to insure compliance with any state law relating to the regulation of motor carriers, trucks or truck tractors." *Id.* Section 74–2108(b) provides similar authority:

> Members of the Kansas highway patrol are hereby authorized and directed to execute and enforce the laws of this state relating to public and private motor carriers of passengers or property, including any rules and regulations relating to such laws, and shall have the power and authority to require the driver of any motor vehicle owned or operated by any such carrier to stop and submit such vehicle to an inspection to determine compliance with such laws and rules and regulations.

*Id.* 74–2108(b). The Kansas statutes define motor carriers as persons who use motor vehicles to transport persons or property for hire or to transport their own goods for commercial purposes.[n2]

---

[n2] Section 66–1,108 of the Kansas statutes provides the following specific definitions:

(a) The term "motor vehicle" when used in this act shall mean any automobile, truck, trailer, semitrailer, tractor, motor bus or any other self-propelled or motor driven vehicle used upon any of the public highways of the state for the purpose of transporting persons or property.

....

(e) The term "public motor carrier of property" when used in this act shall mean any person who holds himself out to the public as willing to undertake for hire to transport by motor vehicle, from place to place, the property of others who may choose to employ him.

(f) The term "public motor carrier of passengers" when used in this act shall mean any

person who holds himself out to the public as willing to undertake for hire to transport by motor vehicle, from place to place, persons who may choose to employ him.

(g) The term "contract motor carrier of property" when used in this act shall mean any person engaged in the transportation by motor vehicle of property for hire and not included in the term "public motor carrier of property" as herein defined.

(h) The term "contract motor carrier of passengers" when used in this act shall mean any person engaged in the transportation by motor vehicle of persons for hire and not included in the term "public motor carrier of passengers" as hereinbefore defined.

(i) The term "private motor carrier of property" when used in this act shall mean any person engaged in the transportation, by motor vehicle, of property sold or to be sold by him in the furtherance of any commercial enterprise other than transportation, but not as a public motor carrier of property, or a contract motor carrier of property: Provided, That the term "private motor carrier of property" shall also include a person who transports the property of others by motor vehicle when such transportation is not for hire but is incident to or in furtherance of a commercial enterprise of such person other than transportation.

*Id.* 66–1,108(a), (e)–(i).

996 F.2d at 1061–1062.

### Analysis

■ In the case at bar, the defendants' reliance on general principles governing traffic stops is misplaced. Had Trooper Smith simply stopped a passenger vehicle, many of their points would appear to be valid and might serve as a basis for suppression. However, because the vehicle operated by Gerald Burch was apparently subject to a valid regulatory stop, *see State v. Williams*, 8 Kan.App.2d 14, Syl. ¶ 1, 648 P.2d 1156 (1982) ("A warrantless inspection of a motor vehicle authorized to transport property for hire and subject to regulations of the State of Kansas

which was stopped by an officer of the Kansas Highway Patrol solely to conduct an inspection pursuant to K.S.A. 74–2108(b) without any suspicion on the part of the officer that there was a violation of any laws of the State of Kansas, does not violate either the Fourth Amendment to the United States Constitution or Section 15 of the Bill of Rights of the Kansas Constitution"); *rev. denied*, 231 Kan. 802,[5] the defendants' motions to suppress based upon an illegal stop are without merit.

■ The defendants contend that pursuant to K.S.A. 8–1759,[6] spot checks such as the one conducted by Trooper Smith may only be conducted "where signs are displayed requiring such stops and where members of the Kansas Highway patrol are conducting such inspections and tests of motor vehicles." Because Trooper Smith's stop did not comply with K.S.A. 8–1759, the defendants contend that the stop was not authorized under the laws of Kansas. The defendants' interpretation of the Kansas statutes is incorrect. K.S.A. 8–1759 simply sets forth the procedure generally governing the manner by which spot checks of all motor vehicles may be conducted—it does not circumscribe the authority specifically granted to the Kansas highway patrol to otherwise perform spot inspections of commercial vehicles. *See* K.S.A. 74–2108(b).

■ None of the arguments advanced by Gale Burch demonstrate that the stop was otherwise pretextual. In support of her pretext argument, Gale Burch argues (1) that the audio portion of the videotape is "myste-

---

5. In *Seslar*, the Tenth circuit, after citing *Williams*, "assume[d], without deciding that Kansas closely regulates the motor carrier industry and that the Kansas regulatory scheme satisfies the *Burger* test because the scheme is informed by a substantial government interest, because warrantless random stops are necessary to further the scheme, and because the scheme provides an adequate substitute for a warrant."

6. K.S.A. 8–1759, spot inspections by highway patrol, provides in pertinent part:

(a) Every driver of a motor vehicle shall stop and submit such vehicle and its equipment to

an inspection of the mechanical condition thereof and such test, with reference thereto, as may be appropriate at any location where signs ·are displayed requiring such stop and where members of the Kansas highway patrol are conducting such inspections and tests of motor vehicles. Such an inspection and test shall be referred to as a "spot inspection." Spot inspections shall be conducted in a manner that the operator of a motor vehicle, whether private or commercial, shall not be unnecessarily inconvenienced by extended detours, unnecessary delays or any other unreasonable cause.

riously" missing;[7] (2) that Trooper Smith has testified that he routinely stops vehicles for the purpose of obtaining a consent to search from the driver; (3) Trooper Smith provided Burch with a clean inspection report prior to commanding Burch to open the back of the truck; Trooper Smith's claim that the Bill of Lading was suspicious is unsupported and in any event "Smith was not even entitled to inspect the bill of lading." The government adequately responds to each of these contentions: (1) the audio recording device simply wasn't working; (2) Trooper Smith has never testified that he routinely stops vehicles for the purpose of obtaining a consent to search from the driver; (3) The handwritten bill of lading was suspicious; Trooper Smith is specifically authorized to inspect bills of lading pursuant to K.A.R. § 82–4–48.

■ As to the defendants' arguments that their detention was unlawful, the government correctly notes that only fifteen minutes elapsed between the time of the stop and the time that the defendants were arrested. Trooper Smith's request to inspect the trailer and its cargo, as well as the manner in which he conducted his inspection, was reasonable. Therefore the detention of Gerald Burch and the truck for purposes of inspection were not unlawful.

The defendants' motions to suppress are denied.

**Motion to Suppress Statement (Dk. 33).**

Gale Burch argues that statements she made to law enforcement officers between June 4, 1995, and June 8, 1995, were not voluntarily made. In her brief,[8] Gale Burch acknowledges that she was read her rights, but denies that she ever waived them. Gale Burch claims that she requested an attorney, but was told she did not need one because she was going to be released. Gale Burch also argues that she made statements based upon implied promises made by officers. Gale Burch also argues that the lengthy

questioning during the three days between her arrest and her arraignment was coercive, rendering her statements involuntary.

The government responds, arguing that Gale Burch's statements were voluntary. The government denies that any promises were made. The passage of time between the time of arrest and arraignment was due "mainly to the defendant's expressed desire to participate in a controlled delivery" and the time necessary to arrange such a delivery. Gale Burch's change of heart was the primary source of delay, and in any event, Gale Burch confessed within three hours of the time she was arrested. The government indicates that the troopers "scrupulously honored the defendant's invocation of her rights."

### Legal Standards

■ In *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." For purposes of *Miranda*, interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980).

■ "An accused's Fifth Amendment right to counsel attaches when he invokes that right during a custodial interrogation." *United States v. Johnson*, 42 F.3d 1312, 1318 (10th Cir.1994), *cert. denied*, ___ U.S. ___, 115 S.Ct. 1439, 131 L.Ed.2d 318 (1995). "Once an attorney is requested, all questioning must cease until counsel is provided unless the right to counsel is waived." *Id.*

---

7. The court has reviewed the videotape of the stop. Although the videotape captures the Trooper Smith's discovery of the marijuana and the actual arrest of the defendants, the majority of the tape is simply a view of the rear of the trailer.

8. Gale Burch did not testify at the suppression hearing.

A suspect who has been informed of his *Miranda* rights "may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612. The burden rests with the government to prove a valid waiver by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168–69, 107 S.Ct. 515, 522–23, 93 L.Ed.2d 473 (1986); *U.S. v. Amos*, 984 F.2d 1067, 1074 (10th Cir.1993). A court may find a proper waiver "[o]nly if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986).[9] In considering whether the confession or statement is one of free will, the courts look to several factors, including: the age, education, and intelligence of the defendant; the length of detention and questioning; whether *Miranda* warnings were given; the defendant's physical and mental characteristics; and the location of the questioning. *U.S. v. Chalan*, 812 F.2d 1302, 1307 (10th Cir.1987), *cert. denied*, 488 U.S. 983 (1988); *see U.S. v. Short*, 947 F.2d 1445, 1449 (10th Cir.1991), *cert. denied*, 503 U.S. 989, 112 S.Ct. 1680, 118 L.Ed.2d 397 (1992). "In no case, however, is any single factor determinative." *Chalan*, 812 F.2d at 1307. Once the defendant validly waives his *Miranda* rights, interrogation may continue until the defendant invokes his rights or changed circumstances suggest the responses have become involuntary. *U.S. v. Abreu*, 730 F.Supp. 1018, 1030 (D.Colo.1990), *aff'd*, 935 F.2d 1130 (10th Cir.), *cert. denied*, 502 U.S. 897, 112 S.Ct. 271, 116 L.Ed.2d 224 (1991).

In deciding if the waiver was intelligent, the court looks at whether "the defendant knew that he did not have to speak to police and understood that statements provided to police could be used against him." *United States v. Hernandez*, 913 F.2d 1506, 1510 (10th Cir.1990) (citation omitted), *cert.*

denied, 499 U.S. 908, 111 S.Ct. 1111, 113 L.Ed.2d 220 (1991). The defendant need not appreciate "the tactical advantage of remaining silent" for the waiver to be intelligent. *Id.* The Supreme Court has "never 'embraced the theory that a defendant's ignorance of the full consequences of his decisions vitiates their voluntariness.'" *Connecticut v. Barrett*, 479 U.S. 523, 530, 107 S.Ct. 828, 832–33, 93 L.Ed.2d 920 (1987) (quoting *Oregon v. Elstad*, 470 U.S. 298, 316, 105 S.Ct. 1285, 1296–97, 84 L.Ed.2d 222 (1985)).

In *United States v. Garot*, 801 F.2d 1241, 1244 (10th Cir.1986), relying on *Hunter v. Swenson*, 372 F.Supp. 287, 298 (W.D.Mo.), *aff'd*, 504 F.2d 1104 (8th Cir.1974), *cert. denied*, 420 U.S. 980, 95 S.Ct. 1410, 43 L.Ed.2d 662 (1975), the Tenth Circuit listed the following questions as relevant in addressing a claim that a confession was unconstitutionally coerced by a promise of leniency:

(1) Was an express or implied promise of lenience made to the defendant?

(2) If no promise of lenience was made, did the defendant reasonably believe that such a promise had been made?

(3) Was the defendant's statement induced by either the promise or his reasonable belief that a promise had been made?

(4) Was the inducive promise coercive?

*See Stohler v. Hargett*, No. 92–5040, 1993 WL 78782, 1993 U.S.App. LEXIS 5599 (10th Cir. March 18, 1993) (same).

For guidance on what constitutes coercion, the court looked to *United States v. Williams*, 447 F.Supp. 631, 636 (D.Del.1978), which rejected an inflexible per se rule that condemns any incriminating statement obtained as a result of promissory inducement. Instead, the court applied a totality of the circumstances test, which considers these non-exhaustive list of factors including whether:

(1) defendant is in custody at the time of the statement;

---

9. A court must satisfy itself of two things before finding a valid waiver of Miranda rights:

"First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.

Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."

*Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986).

(2) defendant is alone and unrepresented by counsel;

(3) the promise or inducement is initiated by prosecuting officials as opposed to defendant or someone acting on his behalf;

(4) defendant is aware of his constitutional and other legal rights;

(5) the potentially incriminating statement is part of an abortive plea bargain;

(6) the promises or inducements leading to the statement are fulfilled by prosecuting authorities; and

(7) defendant is subjected to protracted interrogation or evidence appears on the record to show that coercion precludes the statement from being knowing and intelligent.

*Garot,* 801 F.2d at 1245 (citing *Williams,* 447 F.Supp. at 636–37).

■■ The court, having considered the evidence presented, denies Gale Burch's motion to suppress her statements. Under the totality of circumstances, her comments were voluntary and were not the product of promises by interrogating officers. As the government suggests, the delay caused in taking Gale Burch before a magistrate stemmed from her own cooperation with law enforcement officers. Nor were her statements the product of promises by interrogating officers.

IT IS THEREFORE ORDERED that Gerald Burch's Motion to Suppress Evidence (Dk. 39) is denied.

IT IS FURTHER ORDERED that Gale F. Burch's Motion for disclosure [of Rule 404(b) Evidence] (Dk. 32) is denied as moot.

IT IS FURTHER ORDERED that Gale F. Burch's Motion to Suppress Evidence (Dk. 31) and Motion to Suppress Statement (Dk. 33) are denied.