(875 P.2d 1010)
No. 70,099

STATE OF KANSAS, *Appellee,* v. DOUGLAS C. CAMPBELL, JR.,
*Appellant.*

Opinion filed June 17, 1994.

*Jeffrey L. Shaw,* assistant appellate defender, and *Jessica R. Kunen,* chief appellate defender, for appellant.

*Tony W. Rues,* assistant district attorney, *Joan M. Hamilton,* district attorney, and *Robert T. Stephan,* attorney general, for appellee.

Before GREEN, P.J., LARSON, J., and JAMES W. BOUSKA, District Judge, assigned.

BOUSKA, J.: Douglas C. Campbell, Jr., appeals the trial court's order denying his motion to suppress.

After a bench trial on stipulated facts, Campbell was convicted of possession of marijuana and possession of drug paraphernalia, both class A misdemeanors. He appeals, claiming the trial court erred by denying his motion to suppress based upon an illegal traffic stop.

On June 17, 1992, Kansas Highway Patrol Troopers Smith and Jones stopped Campbell, who was driving a rental truck, on Interstate 70 to conduct a random spot check for compliance with state laws and regulations relating to "motor carriers." Prior to his being stopped by the troopers, Campbell had not violated any traffic laws, and the troopers did not suspect that he was involved in any illegal activities. Campbell was moving his personal belongings from Arizona to Michigan. After checking the truck rental papers, Smith determined that Campbell was not violating any laws relating to motor carriers. After returning Campbell's license, rental papers, and truck inspection form, Smith told Campbell that his documentation was proper.

Then, according to the State's evidence, Campbell was told by Smith that he was free to leave. This is disputed by Campbell. Campbell contended Smith then asked him if he would answer some questions, and Campbell agreed. Smith asked Campbell if he was hauling drugs, weapons, contraband, or large sums of money. Campbell stated he was carrying some guns in the truck. Smith asked if he could check the serial numbers on the guns. Campbell agreed and opened the truck for Smith. While Smith was retrieving the guns, he found a small amount of marijuana and a bong.

Campbell moved to suppress the evidence, claiming the traffic stop constituted an illegal seizure under the Fourth Amendment. After a hearing, the trial court denied Campbell's motion to suppress.

Our standard of review requires us to uphold a trial court's ruling on a motion to suppress evidence if it is supported by substantial competent evidence. *State v. Johnson*, 253 Kan. 75, Syl. ¶ 4, 853 P.2d 34 (1993). The trial court's findings are not in dispute here. Because Campbell appeals from the legal conclusion of the trial court that the random traffic stop employed by the highway patrol troopers was authorized by Kansas statutes and was permitted by the Fourth Amendment, our review of this

matter is unlimited. See *State v. Dorsey*, 13 Kan. App. 2d 286, 287, 769 P.2d 38, *rev. denied* 244 Kan. 739 (1989).

Campbell relies primarily upon *Delaware v. Prouse*, 440 U.S. 648, 59 L. Ed. 2d 660, 99 S. Ct. 1391 (1979), in which it was held that law enforcement officers, acting on their own, could not constitutionally stop automobiles to determine if drivers were licensed or automobiles registered unless the stop was accompanied by an "articulable and reasonable suspicion" that the drivers were unlicensed or the automobiles unregistered or otherwise subject to seizure for violation of the law. 440 U.S. at 663. The Court indicated that alternative methods of conducting spot checks for this purpose may be constitutional, provided they do not involve the "unconstrained exercise of discretion" of the officers in the field. 440 U.S. at 663. The Court, however, qualified its holding in a footnote: "Nor does our holding today cast doubt on the permissibility of roadside truck weigh-stations and inspection checkpoints, at which some vehicles may be subject to further detention for safety and regulatory inspection than are others." 440 U.S. at 663 n. 26.

The trial court relied on two Kansas cases which upheld the constitutionality of spot checks for ensuring compliance with motor carrier laws. In the first case, *State v. Williams*, 8 Kan. App. 2d 14, 648 P.2d 1156, *rev. denied* 231 Kan. 802 (1982), we found specific statutory authority for such stops in K.S.A. 74-2108(b), which states:

"[T]he superintendent and members of the Kansas highway patrol are hereby authorized and directed to execute and enforce the laws of this state relating to public and private motor carriers of passengers or property, including any rules and regulations relating to such laws, and shall have the power and authority to require the driver of any motor vehicle owned or operated by any such carrier to stop and submit such vehicle to an inspection to determine compliance with such laws and rules and regulations."

Although we acknowledged *Prouse*, we considered the random stop of a motor carrier distinguishable from the automobile stop that was at issue in *Prouse*. In comparing a stop of a motor carrier to a permissible regulatory search of a mine operator in a pervasively regulated business, we quoted *Donovan v. Dewey*, 452 U.S. 594, 69 L. Ed. 2d 262, 101 S. Ct. 2534 (1981):

" 'These decisions make clear that a warrant may not be constitutionally required when Congress has reasonably determined that warrantless searches are necessary to further a regulatory scheme and the federal *regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.*' 452 U.S. at 598-600 (emphasis supplied)." 8 Kan. App. 2d at 19.

Because we considered motor carriers in Kansas to be a pervasively regulated industry, we upheld the constitutionality of the spot checks authorized by K.S.A. 74-2108(b). We, however, confined the scope of such searches to determining if there was compliance with the law and the rules and regulations furnished to and known by the commercial business being inspected. 8 Kan. App. 2d at 22.

In the second case, *State v. Moore*, 237 Kan. 523, 701 P.2d 684 (1985), our Kansas Supreme Court considered a similar claim by two defendants who were convicted of driving overweight vehicles in violation of K.S.A. 8-1908. The Department of Revenue had set up temporary scales outside a landfill and required all private trash haulers to submit to a weighing. Defendants were given overweight tickets and were later convicted. The court, in approving the *Williams* holding, stated: "When the driver of a motor carrier operates on a public highway *per se* he does so with the knowledge that his property will be inspected from time to time." 237 Kan. at 528. The court concluded that "designated agents of the Kansas Department of Revenue have the authority to stop motor carriers for spot checks as to their compliance with weight limitations provided under K.S.A. 1984 Supp. 8-1908 without prior knowledge that a violation exists." 237 Kan. at 529.

Turning our attention to this case, we find extensive regulation of Kansas motor carriers arises from statutes and regulations. See K.S.A. 66-1,105 *et seq.*; K.S.A. 66-1302 *et seq.*; K.A.R. 82-4-1 *et seq.* K.S.A. 66-1324 and K.A.R. 82-4-2 have both been cited as authority for permitting the random stop of the rental truck in this case.

K.S.A. 66-1324 relates to the operation of motor carrier inspection stations. The last paragraph of the statute states:

"Nothing in this section shall be construed as prohibiting the superintendent of the highway patrol or any member of the state highway patrol from stopping any or all motor carriers, trucks or truck tractors for the purpose of conducting spot checks to insure compliance with any state law relating to the regulation of motor carriers, trucks or truck tractors . . . ."

K.A.R. 82-4-2 reads as follows:

"(a) Every motor carrier shall instruct its officers, agents, employees and representatives to be familiar with and comply with all the regulations of this commission.

"(b) Every motor carrier and its officers, agents, employees and representatives shall comply with the rules and regulations of this commission and with any reasonable requests of the commission or its duly authorized agents for inspection or examination of any or all operating credentials of motor carrier equipment or required parts and accessories.

"(c) Every motor carrier who has obtained a certificate, license or permit from the Commission shall keep its current mailing address on file with the Commission."

The quoted section of K.S.A. 66-1324 contains no grant of authority. This statute simply states nothing shall be construed as prohibiting the authority of the "highway patrol from stopping any or all motor carriers, trucks or truck tractors for the purpose of conducting spot checks." K.A.R. 82-4-2 clearly applies only to "[e]very motor carrier and its officers, agents, employees, and representatives" and has no application to the random stop of a rental vehicle such as the one in question.

Although there are no specific statutes or regulations authorizing or governing the inspection of rental trucks for purposes of determining compliance with applicable motor carrier laws and regulations, the Kansas Highway Patrol is vested with and exercises the general police powers of the State, which we believe would include the power to inspect such vehicles to determine and enforce compliance with applicable motor carrier laws. K.S.A. 74-2108(a). Such authority, however, is subject to Fourth Amendment constraints.

Because Campbell had rented the truck to haul his personal belongings, he was not a motor carrier as defined by K.S.A. 66-1,108(e)-(i). Consequently, the rationale employed by this court in *Williams,* 8 Kan. App. 2d 14, and the Kansas Supreme Court in *Moore,* 237 Kan. 523, is inapplicable to this case.

The State has an interest in ensuring that motor carriers do not avoid compliance with permit and registration laws through the use of rental trucks. One of the State's witnesses testified at the suppression hearing that nearly 50% of the rental trucks inspected at weigh stations were motor carriers in violation of motor carrier laws. The most common violation was failure to purchase a motor carrier permit from the Kansas Corporation Commission (KCC).

In *Williams*, we found that random KCC spot checks were the most effective means of enforcing compliance with certain motor carrier laws and regulations. The evidence provided in the present case by the troopers supports an argument for allowing random spot checks of rental trucks for the narrow purpose of determining whether those trucks are subject to motor carrier laws and for allowing inspection of operating credentials according to K.A.R. 82-4-2(b). Nevertheless, in line with *Prouse*, such inspections must be conducted pursuant to established "neutral criteria" to safeguard the individual's reasonable expectation of privacy against the unrestrained discretion of the law enforcement officers. See 440 U.S. at 655, 662.

Here, we could find no neutral criteria or guidelines which served to check the discretion of Smith and Jones when they stopped Campbell. Except that the random stops were directed against rental trucks, the troopers were not following any administrative regulations or any coherent well-defined highway patrol policy or other guidelines when they stopped Campbell. When Smith was asked if he stopped rental trucks according to a statewide highway patrol policy, he stated: "There are a lot of troopers that do these." When asked how often he conducted such inspections of rental trucks, he responded: "Just when I— when I'm patrolling if I see one that I think it fits into the day as I'm not busy I'll pull it over for a spot inspection as I do the tractor-trailer units." Jones testified that he stopped rental trucks because he had seen operators of rental trucks purchase KCC permits at weigh stations. Apparently, he inferred that some rental trucks operated by motor carriers failed to purchase the required KCC permit.

When operators of rental trucks are randomly stopped for KCC spot inspections, substantial intrusions on Fourth Amendment

interests occur. Although not directly applicable, it is important to note that even in cases where a commercial property owner's expectation of privacy is relatively low due to his or her participation in a heavily regulated industry, warrantless searches must be conducted according to established guidelines. In *Williams*, we stated:

" '[W]arrantless inspections of commercial property may be constitutionally objectionable if their occurrence is so random, infrequent, or unpredictable that the owner, for all practical purposes, has no real expectation that his property will from time to time be inspected by governmental officials. [Citation omitted.] "Where Congress has authorized inspection but made no rules governing the procedures that inspectors must follow, the Fourth Amendment and its various restrictive rules apply." [Citation omitted.] In such cases, a warrant may be necessary to protect the owner from the "unbridled discretion [of] executive and administrative officers." ' " 8 Kan. App. 2d at 18 (quoting *Donovan v. Dewey*, 452 U.S. at 598-99.).

Therefore, the random stop and inspection of a rental vehicle by a state trooper to determine compliance with motor carrier laws are, in the absence of established neutral criteria or guidelines governing the discretion of the officer in making such stops, constitutionally impermissible under Fourth Amendment proscriptions against unreasonable searches and seizures.

Other courts, under similar facts, applying the same principles, have reached the same or similar conclusions as those adopted here. See, *e.g.*, *U.S. v. Seslar*, 996 F.2d 1058 (10th Cir. 1993); *United States v. McDevitt*, 508 F.2d 8 (10th Cir. 1974); *Dominguez v. Arkansas*, 290 Ark. 428, 720 S.W.2d 703 (1986); *State of New Mexico v. Clark*, 112 N.M. 500, 816 P.2d 1122 (1991).

Although we conclude that the initial stop of Campbell was unconstitutional and, therefore, we need not address Campbell's argument that his consent was tainted by his illegal stop, we conclude the continued questioning of Campbell, after it was determined he had not violated any motor carrier laws, was illegal. In *Williams*, we noted: "The inspector's authority [in making spot checks] is limited to determining [if] there is compliance with the law and the rules and regulations furnished to and known by the commercial business being inspected." 8 Kan. App. 2d at 22.

Furthermore, the exclusionary rule prohibits introduction of evidence obtained from an illegal search or seizure. *State v. Daly*,

14 Kan. App. 2d 310, 314, 789 P.2d 1203, *rev. denied* 246 Kan. 769 (1990). The fruit of the poisonous tree doctrine extends the rule to evidence indirectly obtained from illegal searches and seizures. 14 Kan. App. 2d at 315. Evidence is not fruit of the poisonous tree merely because it would not have been discovered except for the illegal police conduct. Rather, the inquiry is whether the evidence objected to came to light by exploitation of that initial illegality instead of by means sufficiently distinguishable to purge the primary taint. *Brown v. Illinois,* 422 U.S. 590, 599, 45 L. Ed. 2d 416, 95 S. Ct. 2254 (1975); *Wong Sun v. United States,* 371 U.S. 471, 487-88, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963); *State v. Kirby,* 12 Kan. App. 2d 346, 356, 744 P.2d 146 (1987), *aff'd* 242 Kan. 803, 751 P.2d 1041 (1988).

Here, we hold the initial random stop of Campbell's rental truck was unauthorized by law and was unconstitutional. Furthermore, even if the random stop was constitutional, the trooper, after determining Campbell was not a motor carrier, exceeded the scope of a permissible regulatory search as defined in *Williams*. Because the marijuana and bong came to light by exploitation of this illegality, the trial court erred in denying Campbell's motion to suppress.

Reversed and remanded with directions to grant Campbell's motion to suppress evidence and to grant him a new trial.