**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**April 19, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

       Plaintiff-Appellee,

v.

ROBERT J. HERRERA,

       Defendant-Appellant.

No. 05-3057

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 04-CR-20023-02-JWL)**

---

Submitted on the briefs:

Michael J. Gunter of Clayman and Gunter, Kansas City, Missouri, for Defendant-Appellant Robert J. Herrera.

Eric F. Melgren, United States Attorney, and Tristram W. Hunt, Special Assistant United States Attorney, Kansas City, Kansas, for Plaintiff-Appellee United States of America.

---

Before **HENRY**, **McKAY** and **EBEL,** Circuit Judges.

---

**EBEL**, Circuit Judge.

---

A Kansas state trooper pulled over Defendant-Appellant Robert J. Herrera to inspect Herrera's pickup truck pursuant to a Kansas regulatory scheme that permits random inspections of certain commercial vehicles. Herrera's truck, however, was not a commercial vehicle subject to such inspections. Although the Fourth Amendment allows warrantless administrative inspections of pervasively regulated businesses in some instances, the validity of such an inspection is premised on the regulatory scheme giving notice to the members of the class of affected individuals that they are subject to such an inspection. Because Herrera did not have this notice, as he was in fact not a member of the class subject to these random inspections, the trooper's stop of Herrera violated the Fourth Amendment. Further, we decline to extend the good-faith exception to the exclusionary rule to this case because the Fourth Amendment violation is the result of an officer's mistaken belief that Herrera fell within the ambit of the Kansas regulatory scheme. Exercising our jurisdiction under 28 U.S.C. § 1291, we REMAND this cause to the district court with directions to VACATE Herrera's conviction and for further proceedings consistent with this opinion.[1]

I.      FACTS

On March 3, 2004, at 8:00 p.m., a Kansas state trooper encountered Herrera

---

[1]     After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. See Fed. R. App. P. 34(f) and 10th Cir. R. 34.1(G).

driving a Ford F-350 pickup truck with New Mexico license plates eastbound on the Kansas turnpike. The trooper believed Herrera's truck to be a commercial vehicle under Kansas law because it had "[d]ual wheels on the back and a utility bed with a heavy lift hydraulic lifter on the back, and also there was a sign on the back, a paint sign for a paint company." Herrera's truck, however, did not have a Department of Transportation ("DOT") number displayed, as a commercial vehicle would have.

The state trooper testified that, under Kansas law, "commercial vehicles can be stopped at any time to check for compliance with . . . safety regulations." See Kan. Stat. § 74-2108(b); State v. Crum, 19 P.3d 172, 174-78 (Kan. 2001) (upholding state trooper's random stop made under Kan. Stat. § 74-2108); see also United States v. Seslar, 996 F.2d 1058, 1061-62 (10th Cir. 1993) (discussing Kansas statutes permitting state troopers to stop certain commercial vehicles). In fact, however, Herrera's truck was not a commercial vehicle under Kansas law because it weighed 10,000 pounds, one pound short of the definition of a commercial vehicle under Kansas law.[2] The state trooper explained his mistake

---

[2]    Kansas statutes regulate, among others, public and private motor carriers of property. Kan. Stat. § 66-1,111; see also id. § 66-1,108 (further defining these terms). The Government asserts that the state trooper in this case specifically believed that Herrera was a private motor carrier of property. Kansas law describes a private motor carrier of property as "a person who provides transportation of property . . . by commercial vehicle and is not a for hire motor

(continued...)

3

by asserting that he had previously stopped other trucks of the same make and model which had qualified as commercial vehicles because they did have a manufacturer's weight rating over 10,001 pounds. According to the trooper, the only way to ascertain whether or not a truck in fact qualified as a commercial vehicle was to stop the vehicle and "consult the VIN plate that's on the inside of the driver's door" or "run the VIN number through the computer."

After stopping Herrera, the state trooper arrested him because Herrera was unable to produce proof of insurance as required under Kansas law, see Kan. Stat. § 40-3104. The trooper then conducted an inventory search of the truck, in preparation for towing the truck from the highway following Herrera's arrest. During that inventory search, the state trooper discovered twenty-three kilograms

---

[2](...continued)
carrier." Id. § 66-1,108(i) (emphasis added). And Kansas administrative regulations define a commercial motor vehicle to include "[a] vehicle that has a gross vehicle weight rating or gross combination weight rating of 10,001 or more pounds." Kan. Admin. Reg. 82-4-1(c)(1). That rating is established by the manufacturer. See Kan. Stat. § 66-1,108(c). The rating can be ascertained using the vehicle's identification number ("VIN"). In other words, the determination of whether a vehicle is a "commercial vehicle" under Kansas law is an objective determination based upon a weight rating determined by the manufacturer, and does not depend on the actual weight of the truck and its cargo at any given time.

Although the state trooper in this case believed that Herrera's truck was a commercial vehicle, no one now disputes that Herrera's vehicle did not in fact qualify as a commercial vehicle under Kansas law because it did not have a manufacturer's weight rating over 10,000 pounds. Thus, by definition, because Herrera's vehicle was not a commercial vehicle it could not have been a private motor carrier of property subject to regulation under Kan. Stat. § 66-1,111.

4

of cocaine hidden amidst building materials in the truck's bed.

As a result of that discovery, the Government charged Herrera with possessing with the intent to distribute five kilograms or more of a substance containing cocaine, in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1) and (b)(1)(A)(ii).[3]  Herrera moved to suppress the evidence seized, as well as the statements Herrera made, during the traffic stop.  After conducting an evidentiary hearing, the district court denied Herrera's motion to suppress.  Herrera then entered a conditional guilty plea to the charged offense, reserving his right to appeal the district court's decision denying his suppression motion.  This appeal followed.

## II.    DISCUSSION

### A.    Standard of review.

"In reviewing a district court's denial of a motion to suppress evidence, we accept the factual findings of the district court, and its determination of witness credibility, unless they are clearly erroneous."  United States v. Alvarado, 430

---

[3]      Title 21, U.S.C. § 841(a)(1) makes it "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." Section 841(b)(1)(A)(ii)(II) provides for a sentence of between ten years to life in prison for a violation of § 841(a) involving "5 kilograms or more of a mixture or substance containing a detectable amount of . . . cocaine."  And 18 U.S.C. § 2(a) provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

F.3d 1305, 1307-08 (10th Cir. 2005) (quotation omitted). Further, "we consider the evidence in the light most favorable to the district court's ruling;" in this case, in the light most favorable to the Government. Id. at 1308 (quotation omitted). The Government "bears the . . . burden of demonstrating the reasonableness of a warrantless seizure." Seslar, 996 F.2d at 1062. We "review de novo the ultimate determination of reasonableness under the Fourth Amendment." Alvarado, 430 F.3d at 1308 (quotation omitted).

"Whether the good faith exception to the exclusionary rule applies is a question of law that this court [also] reviews de novo." United States v. Johnson, 408 F.3d 1313, 1320 (10th Cir.) (quotation omitted), cert. denied, 126 S. Ct. 458 (2005).

**B.  Whether there was a Fourth Amendment violation.**

"The Fourth Amendment protects the right of the people to be secure . . . against unreasonable searches and seizures." United States v. Bradford, 423 F.3d 1149, 1156 (10th Cir. 2005). "The basic purpose of this Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." Camara v. Municipal Court, 387 U.S. 523, 528 (1967). "A traffic stop is a 'seizure' within the meaning of the Fourth Amendment, 'even though the purpose of the stop is limited and the resulting detention quite brief.'" Bradford, 423 F.3d at 1156 (quoting Delaware

6

v. Prouse, 440 U.S. 648, 653 (1979)).

Ordinarily, the Government seeks to justify a traffic stop based on the existence of probable cause, or at least articulable reasonable suspicion, that there has been a criminal violation or that there is evidence of criminal activity in the vehicle.  See United States v. Tibbetts, 396 F.3d 1132, 1136-37 (10th Cir. 2005); United States v. DeGasso, 369 F.3d 1139, 1143 (10th Cir. 2004).  For example, "[a]n initial traffic stop is valid . . . if based on an observed traffic violation, [or] if the officer has a reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."  Tibbetts, 396 F.3d at 1136-37 (quotation omitted).

In this case, however, the Government does not seek to justify the stop based upon the existence of any individualized suspicion that Herrera was involved in criminal activity.[4]  Ordinarily "[a] search or seizure is . . . unreasonable in the absence of individualized suspicion of wrongdoing."  City of Indianapolis v. Edmond, 531 U.S. 32, 37 (2000).  Nonetheless, in this case, the Government seeks to justify its initial seizure of Herrera as a random,

---

[4]    Before the district court, the Government did assert that Herrera's truck had drifted over the highway's fog line, a traffic violation that could have justified the trooper's stopping Herrera.  The district court, however, rejected that justification and the Government has not appealed from that decision.

7

warrantless administrative seizure and search[5] permitted by the Kansas statutory scheme regulating motor carriers. See id. (recognizing that "searches for certain administrative purposes without particularized suspicion of misconduct" are allowable "provided that those searches are appropriately limited").

"[T]he Fourth Amendment's prohibition against unreasonable searches [still] applies to administrative inspections of private commercial property." Donovan v. Dewey, 452 U.S. 594, 598 (1981). But under the Fourth Amendment, an administrative search is very different from a search based upon individualized suspicion.

> A regulatory search . . . does not require probable cause as defined traditionally by the courts. In general, probable cause, and the less stringent standard of reasonable suspicion, require particularized suspicion–that is, the officer must have some articulable basis to believe that the individual to be searched or seized has committed or is committing a crime. In contrast, a regulatory search is justified if the state's interest in ensuring that a class of regulated persons is obeying the law outweighs the intrusiveness of a program of searches or seizures of those persons.

Seslar, 996 F.2d at 1061 (emphasis in original).

The Supreme Court has further distinguished a regulatory search of commercial property from "searches of private homes, which generally must be conducted pursuant to a warrant in order to be reasonable," holding that

---

[5]     Cases addressing such seizures and searches refer to them as both "regulatory" and as "administrative" searches. We also employ both terms interchangeably here.

8

"legislative schemes authorizing <u>warrantless</u> administrative searches of commercial property do not necessarily violate the Fourth Amendment." <u>Donovan</u>, 452 U.S. at 598 (emphasis added). The Court has recognized that the "expectation of privacy in commercial premises . . . is different from, and indeed less than, a similar expectation in an individual's home. This expectation is particularly attenuated in commercial property employed in 'closely regulated' industries." <u>New York v. Burger</u>, 482 U.S. 691, 700 (1987) (citation omitted); <u>see also</u> <u>Donovan</u>, 452 U.S. at 601-02; <u>Marshall v. Barlow's, Inc.</u>, 436 U.S. 307, 312-13 (1978); <u>United States v. Biswell</u>, 406 U.S. 311, 313-17 (1972); <u>Seslar</u>, 996 F.2d at 1061. There are "[c]ertain industries [that] have such a history of government oversight that no reasonable expectation of privacy could exist for a proprietor . . . ," <u>Burger</u>, 482 U.S. at 700 (quotations, citation omitted); that is, "when an entrepreneur embarks upon such a business, he has voluntarily chosen to subject himself to a full arsenal of governmental regulation," <u>Marshall</u>, 436 U.S. at 313; <u>see also</u> <u>Biswell</u>, 406 U.S. at 316 (noting that "[w]hen a [firearms] dealer chooses to engage in this pervasively regulated business and to accept a federal license, he does so with the knowledge that his business records, firearms, and ammunition will be subject to effective inspection"). "Industries such as these," which includes the sale of liquor and firearms,

> fall within [a] carefully defined class[] of cases. . . . The element that distinguishes these enterprises from ordinary businesses is a long

9

tradition of close government supervision, of which any person who chooses to enter such a business must already be aware. . . . [B]usinessmen engaged in such . . . licensed and regulated enterprises accept the burdens as well as the benefits of their trade . . . . The businessman in a regulated industry in effect consents to the restrictions placed upon him.

Marshall, 436 U.S. at 313 (quotation, citation omitted).

Because the owner or operator of commercial premises in a "closely regulated" industry has a reduced expectation of privacy, the warrant and probable-cause requirements, which fulfill the traditional Fourth Amendment standard of reasonableness for a governmental search, have lessened application in this context. Rather, we conclude that, as in other situations of "special needs," where the privacy interests of the owner are weakened and the government interests in regulating particular businesses are concomitantly heightened, a warrantless inspection of commercial premises may well be reasonable within the meaning of the Fourth Amendment.

This warrantless inspection, however, even in the context of a pervasively regulated business, will be deemed to be reasonable only so long as three criteria are met. First, there must be a "substantial" government interest that informs the regulatory scheme pursuant to which the inspection is made.

Second, the warrantless inspections must be necessary to further the regulatory scheme. . . .

Finally, the statute's inspection program, in terms of the certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant. In other words, the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers.[6] To perform this first function,

_____

[6]     The Supreme Court has indicated that a warrant stating with

(continued...)

10

the statute must be sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes. In addition, in defining how a statute limits the discretion of the inspectors, we have observed that it must be carefully limited in time, place, and scope.

Burger, 482 U.S. at 702-03 (citations, quotations, alterations omitted; footnote, emphasis added). "The random detention and inspection of a vehicle used in a closely regulated industry . . . must meet essentially the same requirements as a warrantless regulatory search of business premises." V-1 Oil Co. v. Means, 94 F.3d 1420, 1425 (10th Cir. 1996).

In this case, Herrera does not challenge the constitutional validity of the Kansas statutory scheme regulating motor carriers; nor does he challenge the trooper's authority under that scheme to stop vehicles subject to that regulation for random inspection. For purposes of this appeal, therefore, we will assume that motor carriers are engaged in a pervasively regulated industry and that the Kansas regulatory scheme applicable to those motor carriers properly permits state troopers to stop commercial vehicles randomly for inspection. See United States v. Burch, 153 F.3d 1140, 1142 (10th Cir. 1998) ("assum[ing] without

---

[6](...continued)
particularity the place to be searched or the items to be seized not only prevents general searches but "assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search." Groh v. Ramirez, 540 U.S. 551, 561 (2004) (quotation omitted).

deciding that the regulations of the trucking industry in Kansas performed the two basic functions of a warrant" as Burger requires); Seslar, 996 F.2d at 1063 n.3 ("assum[ing], without holding, that Kansas closely regulates the motor carrier industry and that the Kansas regulatory scheme satisfies the Burger [three-part] test").

The problem this case presents is that Herrera's truck did <u>not</u> fall within Kansas's definition of a commercial vehicle subject to these random regulatory seizures and searches. Herrera was <u>not</u> engaging in a closely regulated industry and, thus, would <u>not</u> have had any reason to know that his truck could be subject to a random inspection.[7] See Seslar, 996 F.2d at 1062 (noting that the Supreme Court cases addressing regulatory searches "all involve defendants who were <u>obviously</u> engaged in the regulated industry") (emphasis added).

It is clear, then, that the state trooper's stopping Herrera cannot be justified under the Kansas regulatory scheme. We reached a similar conclusion in Seslar, 996 F.2d 1058. There, this court held that "the closely regulated industry line of cases does not justify the warrantless search of <u>un</u>regulated persons." Id. at 1063

---

[7] In contrast to closely regulated industries, the Supreme Court has held that the government's regulation of automobiles generally does not justify "sporadic and random stops of individual vehicles." Prouse, 440 U.S. at 657, 662; see also id. at 663 (holding "that persons in automobiles on public roadways may not . . . have their travel and privacy interfered with at the unbridled discretion of police officers" simply because the government regulates vehicles and their drivers); Seslar, 996 F.2d at 1063.

12

(emphasis in original). That case controls here.

In Seslar, a Kansas state trooper stopped a rental truck to determine if the truck was subject to Kansas regulations governing motor carriers.[8] See id. at 1059. In that case, this court rejected the Government's assertion that a Kansas state trooper can randomly "stop . . . any truck on the highway . . . , whether operated by a motor carrier or not, to first determine whether [the truck] is" covered by that scheme. Id. at 1062; see also id. at 1063. "[B]ecause the justification for permitting warrantless [regulatory] searches is that persons doing business in closely regulated industries have a significantly reduced expectation of privacy," id. at 1061, this court held that such a stop was not justified by the regulatory scheme if the truck did not fall within the parameters of that regulation, see id. at 1062-63. See also State v. Campbell, 875 P.2d 1010, 1013-14 (Kan. Ct. App. 1994) (holding random stop of rental truck that was transporting private property and thus was not subject to Kansas regulations governing motor carriers, violated Fourth Amendment); Dominguez v. State, 720 S.W.2d 703, 707-08 (Ark. 1986) (holding that a statute that arguably authorized

---

[8]     The vehicle at issue in Seslar was a rental truck. See 996 F.2d at 1059. A rental truck carrying commercial property was subject to random inspections under Kansas law. See id. at 1061-62 & 1062 n.2. But a rental truck carrying only private property was not subject to those random inspections. See id. The officer in Seslar admitted he had no reason to believe that the rental truck he stopped was carrying commercial property; rather, he stopped the truck just to find out what it was carrying. See id. at 1059.

random stops of motor carriers could not be read to authorize random stops of any motor vehicle merely to determine whether the detainees belonged to the regulated class), cited with approval in Seslar, 996 F.2d at 1063.

Applying Seslar to this case, then, we conclude that because Herrera's truck was not a commercial vehicle subject to the Kansas regulatory scheme, that scheme cannot justify the state trooper's stopping Herrera. Because that is the only justification the Government offers for this stop, that warrantless stop violated the Fourth Amendment.

The Government further argues, however, that there can be no constitutional violation here because, even though Herrera's truck did not in fact qualify as a commercial vehicle under Kansas law, the state trooper had an objectively reasonable, yet mistaken, belief that it did. Indeed, the trooper was mistaken by only one pound in believing that Herrera's truck was a commercial vehicle subject to the Kansas regulatory scheme.

The Government's argument might be persuasive if it had sought to justify this stop based upon individualized suspicion; that is, if the Government had argued that the trooper had probable cause or at least reasonable suspicion to believe that Herrera was involved in criminal activity. This court has "consistently held that an officer's mistake of fact . . . may support probable cause or reasonable suspicion necessary to justify a traffic stop," provided the

14

officer's mistake of fact was objectively reasonable.[9]  Tibbets, 396 F.3d at 1138;

see also DeGasso, 369 F.3d at 1144; United States v. Vercher, 358 F.3d 1257,

1261 (10th Cir. 2004) (noting "reasonable suspicion may be supported by an

'objectively reasonable' good faith belief even if premised on factual error"); cf.

Illinois v. Rodriguez, 497 U.S. 177, 179, 186 (1990) (upholding validity of search

of apartment premised on officer's factual mistake in believing that third party

consenting to search possessed sufficient common authority over premises such

that she could validly consent).

In this case, however, the Government does not seek to justify its stop of

Herrera based upon the existence of probable cause or reasonable suspicion that

he was involved in criminal activity.  Rather, the Government justifies the stop

only as a random regulatory inspection.  Therefore, our cases addressing the

existence of reasonable suspicion or probable cause based upon factual mistakes

are inapposite.  That is because, as we have noted, a regulatory inspection is not

premised on an officer's on-the-spot perception that he has an individualized

suspicion that the specific individual to be seized and searched is involved in

---

[9]      On the other hand, an officer's legal mistakes will not preclude a
Fourth Amendment violation.  See Tibbetts, 396 F.3d at 1138; DeGasso, 369 F.3d
at 1144.  While an officer may make an objectively reasonable factual mistake, a
"failure to understand the law by the very person charged with enforcing it is not
objectively reasonable."  Tibbetts, 396 F.3d at 1138 (emphasis in original); see
also DeGasso, 369 F.3d at 1144.

15

criminal activity. An administrative search is instead premised on the individual subject to the warrantless seizure and search knowingly and voluntarily engaging in a pervasively regulated business, and on the existence of a statutory scheme that puts that individual on notice that he will be subject to warrantless administrative seizures and searches. See generally Burch, 153 F.3d at 1143 (distinguishing generally between traffic stops premised on reasonable suspicion and those premised on an administrative search).

The Government's argument that there was no Fourth Amendment violation in this case because the state trooper had an objectively reasonable, but mistaken, belief that Herrera was subject to a random administrative inspection focuses on the wrong participant in the seizure at issue here. The validity of an administrative seizure and search does not turn on whether or not the trooper had an objectively reasonable belief that Herrera's truck qualified as a commercial vehicle subject to random inspections. Rather, it turns on Herrera's decision to engage in a pervasively regulated business, knowing that by doing so he would be subject to random warrantless inspections. The validity of an administrative inspection is premised on the fact that the owner of the property subject to the search "cannot help but be aware that his property will be subject to periodic [administrative] inspections undertaken for specific purposes." Burger, 482 U.S. at 703 (quotation omitted). It is only under such circumstances that the individual

16

citizen has a reduced expectation of privacy in his or her commercial property that justifies a warrantless regulatory search and seizure under the Fourth Amendment. See id. at 700, 703. But in this case, Herrera had never chosen to engage in a pervasively regulated business and so, of course, had no notice or understanding that he could be subject to random warrantless seizures and inspections. He was, then, completely unaware (and reasonably so) that a law enforcement officer might seize and search his vehicle randomly pursuant to a regulatory scheme that did not apply to him.[10] See Seslar, 996 F.2d at 1062-63; see also Dominguez, 720 S.W.2d at 707.

The state trooper in this case testified that the only way to determine whether or not Herrera's truck weighed over 10,000 pounds and was thus a commercial vehicle subject to random seizures and searches under Kansas law was to stop the truck and check the VIN plate.[11] But permitting a state trooper to

_____

[10] We also note that a state trooper need not make the decision to effect a random regulatory seizure under the same time restrictions that often attend the decision to stop a vehicle based upon probable cause or reasonable suspicion to believe the vehicle is involved in criminal activity. And the Government does not assert that there were any exigent circumstances present in this case that might warrant an immediate random motor carrier inspection.

[11] As previously mentioned, Kansas law bases its definition of a commercial vehicle in part on the vehicle's "weight rating." Kan. Admin. Reg. 82-4-1(c)(1). That rating is established by the manufacturer, see Kan. Stat. § 66-1,108(c), and can be ascertained using the VIN. So requiring a trooper to distinguish between vehicles that are and are not commercial vehicles subject to random searches does not require a trooper to speculate as to a particular

(continued...)

17

stop any vehicle simply to ascertain whether or not the vehicle was subject to a random regulatory search would allow the officer the unbridled discretion that the Supreme Court sought to preclude in Burger. See Campbell, 875 P.2d at 1013-14; see also Dominguez, 720 S.W.2d at 707. This Seslar forbids. See 996 F.2d at 1062-63. "'It would be a circumvention of the Fourth Amendment if the business exception to the probable cause or warrant requirement could be used wholly out of the context of its justification.'" Id. at 1063 (quoting Dominguez, 720 S.W.2d at 707) (alteration omitted).

In summary, "[t]o determine the initial validity of a traffic stop, we ask

---

[11](...continued)
vehicle's weight, given the vehicle's specific cargo at any given time. And although Herrera's truck was very close to having a manufacturer's weight rating that would have made it a commercial vehicle subject to the Kansas regulatory scheme, the state trooper in this case testified that determining whether other vehicles have weight ratings that fall within these regulations is "easy." For example, "large semi trucks . . . are easy to tell because of their manufacture . . . . They are all manufactured over 10,000 pounds." Further, in closer cases such as Herrera's pickup truck, it seems possible that the manufacturers' weight ratings for each brand and model of vehicle are, or could be made, available to state troopers who could then determine the manufacturer's weight rating for a particular make and model of vehicle before stopping it. In any event, a trooper's having to determine the manufacturer's weight rating for a vehicle will generally be easier than it was for the trooper in Seslar to determine whether a rental truck was transporting commercial or private property, see Seslar, 996 F.2d at 1061-62. Yet we concluded in Seslar that there was a Fourth Amendment violation when a Kansas state trooper mistakenly stopped a rental truck that turned out to be carrying only private, not commercial, property. See id. at 1063; see also Campbell, 875 P.2d at 1013-14 (holding under Kansas scheme regulating motor carriers, state trooper cannot stop rental truck to determine whether it is carrying commercial property such that it would be subject to those regulations).

18

whether the stop was objectively justified." DeGasso, 369 F.3d at 1143 (quotation omitted). Because the Government sought to justify its stopping Herrera in this case based only upon a regulatory scheme permitting random administrative inspections of commercial vehicles, the authority for that stop must come from that regulatory scheme. And because Herrera's truck did not fall within the class of vehicles subject to that regulatory scheme's random inspections, the state trooper in this case had no authority to stop Herrera. The trooper's seizure of Herrera, therefore, violated the Fourth Amendment.

**C. Whether the good-faith exception to the application of the exclusionary rule should apply under the circumstances of this case.**

Having concluded that there was a Fourth Amendment violation in this case because Herrera's truck was not a commercial vehicle subject to the random inspections permitted under the Kansas scheme regulating motor carriers, we must decide what to do about that violation. That question leads us to United States v. Leon, 468 U.S. 897 (1984). In Leon, the Supreme Court accepted that there had been a Fourth Amendment violation when police officers seized evidence pursuant to a search warrant that a court later determined was not supported by probable cause. See id. at 902-03, 905. The Supreme Court, therefore, had to decide the appropriate remedy for the Fourth Amendment violation occurring in that case. See id. at 906 (noting that "[w]hether the exclusionary sanction is

19

appropriately imposed [as a remedy] in a particular case, our decisions make clear, is an issue separate from the question whether the Fourth Amendment rights of a party seeking to invoke the rule were violated by police conduct") (quotation omitted); see also United States v. Nielson, 415 F.3d 1195, 1202 (10th Cir. 2005), petition for cert. filed, 74 U.S.L.W. 3532 (U.S. Mar. 10, 2006) (No. 05-1152).

Ordinarily, courts will remedy a Fourth Amendment violation by invoking the exclusionary rule to exclude the Government's introduction of the unlawfully seized evidence as direct evidence against the defendant in a criminal prosecution. See Illinois v. Krull, 480 U.S. 340, 347 (1987); see also James v. Illinois, 493 U.S. 307, 311 (1990) (noting exclusionary rule is the "principal mode of discouraging lawless police conduct. Without it the constitutional guarantee against unreasonable searches and seizures would be a mere form of words.") (alteration, quotation omitted); United States v. Hill, 60 F.3d 672, 677-78 (10th Cir. 1995) (discussing exclusionary rule). But the exclusionary rule is only "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, [and is not] a personal constitutional right of the party aggrieved." Leon, 468 U.S. at 906 (quotation omitted). Further, the exclusionary rule "is harsh, requiring the exclusion of potentially reliable evidence of wrongdoing." Nielson, 415 F.3d at 1202. Therefore, the Supreme Court in Leon concluded that the exclusionary rule should be invoked only when

20

doing so furthers the purpose of that rule, which is "designed to deter police misconduct." Leon, 468 U.S. at 916 (emphasis added). The Leon Court concluded that, even if an officer in a given case obtained evidence in violation of the Fourth Amendment, it made no sense to exclude that evidence if the officer was nevertheless acting in an objectively reasonable manner when he seized the evidence. See id. at 918-20. We will ordinarily not deter, nor do we want to deter, objectively reasonable police conduct. See id. In Leon, then, the Supreme Court adopted a good-faith exception to the application of the exclusionary rule and specifically applied that exception where "an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope," even though the search warrant was later deemed to be invalid. Id. at 920.

In this case, the Government asks that we extend Leon's good-faith exception and decline to exclude the evidence obtained during the state trooper's unconstitutional but arguably good-faith traffic stop of Herrera. We decline to do so in this case for two reasons. First, Leon's good-faith exception applies only narrowly, and ordinarily only where an officer relies, in an objectively reasonable manner, on a mistake made by someone other than the officer. But in this case, it was the state trooper's own factual mistake that led to the Fourth Amendment violation that occurred in this case.

Second, the Fourth Amendment violation in this case occurred in the context of the state trooper's conducting a random warrantless administrative search of someone who was not in fact subject to such a search. Unlike a stop based upon probable cause or reasonable suspicion, the validity of a warrantless administrative a search is premised on the party who is subject to the search being aware that he is subject to such a search. In the context of an administrative search, limiting an officer's ability to stop only those individuals who are actually subject to such a search will satisfy both Leon's purpose of deterring unconstitutional police errors as well as the Fourth Amendment principles underlying the validity of a warrantless administrative search–that those being searched be objectively aware that they are subject to such a search.

1. **Leon's good-faith exception is ordinarily limited to situations when the police officer reasonably relied upon the judgment of a neutral third party.**

Courts applying the good-faith exception recognized in Leon have done so only in very narrow circumstances. The Supreme Court, although expanding the good-faith exception's application a bit beyond the facts of Leon, has still limited that exception to circumstances where someone other than a police officer has made the mistaken determination that resulted in the Fourth Amendment violation. In Leon, for example, it was the magistrate who mistakenly issued the search warrant without probable cause. See 468 U.S. at 905, 913-14, 920-21.

22

Such circumstances represent the most common application of Leon's good-faith exception. Thus, this court has applied the good-faith exception primarily when, as in Leon, the officers involved in a seizure or search have acted in an objectively reasonable manner by relying on a warrant issued by a neutral and detached magistrate.[12] See, e.g., United States v. Soderstand, 412 F.3d 1146, 1152 (10th Cir. 2005), cert denied, 126 S. Ct. 1478 (2006); United States v. Riccardi, 405 F.3d 852, 863-64 (10th Cir.), cert. denied, 126 S. Ct. 299 (2005); United States v. Lora-Solano, 330 F.3d 1288, 1294-95 (10th Cir. 2003) (dicta).

The Supreme Court did extend Leon's good-faith exception, applying it where officers conducting a search relied in good faith, not on a warrant, but on a statute's regulatory scheme that permitted warrantless administrative searches, when that statutory regulatory scheme was later declared unconstitutional. See Krull, 480 U.S. at 343, 346, 353, 356-57. But in Krull, it was the legislature's mistake in enacting an unconstitutional statute, rather than any error on the officer's part, that led to the Fourth Amendment violation. See id. at 349-53; see

_____

[12]

"The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."

United States v. Ramirez, 63 F.3d 937, 940-41 (10th Cir. 1995) (quoting Johnson v. United States, 333 U.S. 10, 13-14 (1948)).

23

also United States v. Vanness, 342 F.3d 1093, 1094-96, 1097-1100 (10th Cir. 2003) (applying Krull and the good-faith exception, without deciding whether city noise ordinance was constitutional, where officers reasonably relied on that ordinance to stop defendant).

In addition, the Supreme Court indicated that the Leon exception to the exclusionary rule would apply where an "officer [had] acted in reliance on a police record indicating the existence of an outstanding arrest warrant," if that error was made by a court clerk's employee rather than a police officer. See Arizona v. Evans, 514 U.S. 1, 3-4, 14-16 (1995). In Evans, the Supreme Court remanded for the state court to determine who was responsible for the error, a court clerk's employee or the police. See id. at 15-16.

> If court employees were responsible for the erroneous computer record, the exclusion of evidence at trial would not sufficiently deter future errors so as to warrant such a severe sanction. . . .
>
> . . .
>
> If it were indeed a court clerk who was responsible for the erroneous entry on the police computer, application of the exclusionary rule . . . could not be expected to alter the behavior of the arresting officer. . . . Excluding the evidence can in no way affect the officer's future conduct unless it is to make him less willing to do his duty. . . . Application of the Leon framework supports a categorical exception to the exclusionary rule for clerical errors of court employees.

Id. at 14, 15-16 (quotation, alteration omitted).

24

Thus, application of Leon's good-faith exception to the exclusionary rule turns to a great extent on whose mistake produces the Fourth Amendment violation. And because the purpose underlying this good-faith exception is to deter police conduct, logically Leon's exception most frequently applies where the mistake was made by someone other than the officer executing the search that violated the Fourth Amendment. The Supreme Court has never extended Leon's good-faith exception beyond circumstances where an officer has relied in good faith on a mistake made by someone other than the police; that is, on someone outside the police officer's "often competitive enterprise of ferreting out crime," Leon, 468 U.S. at 914 (quotation omitted). See also 1 LaFave, Search and Seizure § 1.3(f) (noting that Leon "does not allow law enforcement authorities to rely on an error of their own making") (quotation omitted); 2 LaFave, Search and Seizure § 3.5(d) (noting "the Evans rationale would seem inapplicable whenever the mistake was instead attributable to the law enforcement agency"); cf. Groh, 540 U.S. at 563-64 (refusing to apply the good-faith exception, and refusing to conclude that the officer was entitled to qualified immunity in a civil action for damages, where the officer "himself prepared the invalid warrant" and so "he may not argue that he reasonably relied on the Magistrate's assurance that the warrant contained an adequate description of the things to be seized and was therefore

25

valid").[13]

Nor has this court ever extended <u>Leon</u> to a case where it was the officer's mistake, rather than that of a neutral third party, that resulted in a Fourth Amendment violation.[14]  In <u>United States v. Scales</u>, 903 F.2d 765 (10th Cir. 1990), this court refused to apply <u>Leon</u>'s good-faith exception where <u>officers,</u> acting without a warrant, unlawfully seized a suitcase and held it for twenty-four hours before obtaining a warrant.  <u>See</u> <u>id.</u> at 767-68.  In doing so, this court specifically "decline[d] to extend the holding of <u>Leon</u> to cases in which the good faith of the officer cannot be presumptively established by the existence of a search warrant valid on its face."  <u>Id.</u> at 768.  And in <u>United States v. Owens</u>, 782

_____

[13]    "[T]he same standard of objective reasonableness that . . . applie[s] in the context of a suppression hearing in <u>Leon</u> defines the qualified immunity accorded an officer" in a civil damages action.  <u>Groh</u>, 540 U.S. at 565 n.8 (quotation omitted).

[14]    In <u>United States v. Johnson</u>, 364 F.3d 1185 (10th Cir. 2004), this court addressed an officer's <u>Terry</u> stop of an individual walking down the street.  <u>See</u> <u>id.</u> at 1187, 1188-89.  Although this court discussed <u>Leon</u>'s good-faith exception to the exclusionary rule in that case, <u>see</u> <u>id.</u> at 1195, this court nevertheless held that the <u>Terry</u> stop was reasonable, and thus not a Fourth Amendment violation.  <u>See</u> <u>id.</u> at 1188-95 (holding brief stop was reasonable under the circumstances).  Similarly, in <u>United States v. Walraven</u>, while this court again mentioned <u>Leon,</u> it in fact determined that the stop at issue there was based upon articulable reasonable suspicion and thus comported with Fourth Amendment requirements.  <u>See</u> 892 F.2d at 974-75.  And in <u>United States v. Cotton</u>, 751 F.2d 1146, 1148-50 & 1149 n.2 (10th Cir. 1985), this court, although mentioning <u>Leon,</u> ruled that the seizure of evidence in that case did not violate the Fourth Amendment.  These cases, then, while mentioning <u>Leon,</u> did not actually need to apply <u>Leon</u>'s good-faith exception because this court ultimately concluded in those cases that there was no Fourth Amendment violation.

F.2d 146 (10th Cir. 1986), this court again declined to apply the good-faith exception where <u>officers</u> had effected an unlawful warrantless entry into a hotel room. <u>Id.</u> at 150-52. In reaching that decision, this court specifically noted that the officers had watched that hotel room for five and one-half hours without making any attempt to obtain a search warrant. <u>See</u> <u>id.</u> at 152.

This authority, from both the Supreme Court and this circuit, indicates that <u>Leon</u>'s good-faith exception to the exclusionary rule generally applies only narrowly outside the context of a warrant. It has not been applied when the mistake resulting in the Fourth Amendment violation is that of the officer conducting the seizure and search, rather than a neutral third party not engaged in the "competitive endeavor of ferreting out crime." <u>Leon</u>, 468 U.S. at 914 (quotation omitted). In light of this very narrow application of <u>Leon</u>'s good-faith exception, we are disinclined to extend that exception to the facts of this case, where a state trooper conducted a random, warrantless seizure to effect an administrative search based upon the officer's own mistaken belief that Herrera's truck was subject to such a random inspection.

We acknowledge that this court has, on one occasion, suggested extending the good-faith exception in the context of a warrantless administrative search, where the officers conducting the search interpreted their authority to do so under the relevant statutes in an objectively reasonable manner. <u>See</u> <u>Johnson</u>, 408 F.3d

at 1322-23. But <u>Johnson</u> is different from this case. In <u>Johnson</u>, officers conducted a warrantless administrative search of a salvage yard pursuant to an Oklahoma statutory regulatory scheme. See <u>id.</u> at 1316 & n.2. The officers conducting the inspection searched not only the business premises, but they also searched a locked toolbox found at the salvage yard and belonging to a salvage yard employee. See <u>id.</u> at 1317-19. This court first determined that the relevant Oklahoma statutes authorized the officers' search of both the salvage yard and the locked toolbox.[15] See <u>id.</u> at 1320-22. In dicta, this court then indicated that even if these Oklahoma statutes did not permit the search, the good-faith exception to the exclusionary rule would apply in light of the officers' good-faith reliance on those statutes. See <u>id.</u> at 1322-23. More specifically, as to the search of the locked toolbox, this court indicated that, even if the Oklahoma statutes did not permit that aspect of the administrative search, <u>Leon</u>'s good-faith exception would apply because the officers reasonably interpreted those statutes to permit the toolbox search. See <u>id.</u> at 1323.

> [T]he officers would have no reason to believe they could not demand to inspect inside a locked container which they reasonably believed to be subject to the search, particularly when they had developed

---

[15] The Oklahoma statutes in <u>Johnson</u> had never been invalidated, as the statute in <u>Krull</u> had, and "nothing in these [Oklahoma] statutes would have given rise to [a] suspicion" that the statutes were invalid. <u>Johnson</u>, 408 F.3d at 1323. Therefore, there was no Fourth Amendment violation in <u>Johnson</u>. See <u>id.</u> at 1322, 1323.

28

additional [reasonable] suspicion [during the rest of the search] concerning its possible contents. In sum, the officers relied in good faith on the administrative inspection statutes, as interpreted by Oklahoma cases, and in their objectively reasonable applicability to the inspection conducted at Autoplex Salvage.

Id.

In Johnson, then, this court indicated that the good-faith exception would apply where officers acted on their own objectively reasonable interpretation of the legal authority granted to them by Oklahoma's statutory scheme permitting warrantless administrative inspections. See id. That conclusion is consistent with Leon. In both Johnson and Leon, the officers objectively relied upon the authority and judgment of a third party that the search being authorized was consistent with the United States Constitution—in the case of Leon, the officers relied upon the magistrate who issued the warrant, and in the case of Johnson, officers relied upon the legislature that authorized the search by enacting its regulatory statute. If it is reasonable for an officer to accept the legislative determination that a particular regulatory search is consistent with the constitution, then it is also reasonable to charge the party being searched with notice that he or she is subject to a legislative search, notice which is the underpinning of a valid regulatory search as enumerated in Burger.

As we indicated earlier, Leon's focus on deterring police conduct requires that Leon's good-faith exception almost always applies only when there is a

29

determination made by a third party upon which the officer reasonably relied to conduct the challenged seizure or search, such as the magistrate in Leon, the legislature in Krull and in Johnson, and the court clerk in Evans. This third party judgment provides a neutral check on the officer's conduct. But in this case, although the legislature determined that state troopers could randomly stop and inspect commercial vehicles, no third party made the determination that Herrera's truck was a commercial vehicle subject to those random warrantless inspections. And so to apply Leon under these circumstances would extend that good-faith exception beyond its pedigree. While we do not conclude that Leon can never apply where the officer has not reasonably relied on a third party's determination that a seizure or search is lawful, we think Leon could only be extended that far under very unusual circumstances. Such circumstances are not presented in this case. For these reasons, then, we decline to extend Leon's good-faith exception to the application of the exclusionary rule to the facts of this case.

Even if we were inclined to apply Leon's good-faith exception to a situation where the officer was not relying on the judgment of a neutral third party, we would not be inclined to apply that good-faith exception to the facts of this particular case. The Leon good-faith exception to the exclusionary rule is reserved for situations where the exclusion of the illegally obtained evidence would not deter illegal police conduct. But here, the exclusion of the evidence

30

would effectively deter the illegal police conduct that produced the Fourth Amendment violation in the first place.

First, "our good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal." Leon, 468 U.S. at 922 n.23. In light of that, we deem the state trooper in this case to have been aware of our earlier decision in Seslar, 996 F.2d at 1062-63, indicating that a state trooper could not, under this Kansas regulatory scheme, stop a vehicle just to determine whether the vehicle was subject to random administrative inspections. See Nielson, 415 F.3d at 1203-04.[16]

Second, excluding the evidence in this case will deter police officers from conducting unauthorized administrative stops when the facts to support an administrative search are ambiguous. Administrative searches are ordinarily more deliberative than other searches and seizures, and that, along with clear statutory parameters, are the essential ingredients allowing police to dispense with the requirement of a warrant or individualized suspicion in the context of a regulatory

---

[16] We do not require that a state trooper resolve unsettled law or anticipate future legal rulings. But Seslar clearly resolved this issue. Cf. United States v. Nolan, 199 F.3d 1180, 1185 (10th Cir. 1999) (holding a "reasonable officer not versed in the intricacies of the law could not properly be charged with knowledge that the search of Defendant Nolan's residence might be unconstitutional under the Fourth Amendment," where the state of relevant Fourth Amendment law at that time was unsettled) (emphasis in original); United States v. Leary, 846 F.2d 592, 609 (10th Cir. 1988) (noting that "we are not expecting the agents to anticipate legal determinations or resolve ambiguities in the law").

inspection. Thus, limiting invocation of the regulatory search to situations where the search, in fact, occurs within a regulated industry seems most consistent with the rationale underlying the validity of regulatory searches under the Fourth Amendment. And, as we observed in footnote eleven, in most regulatory stops involving commercial vehicles made pursuant to a regulatory scheme, it will be obvious whether the vehicle falls within the definition of vehicles being regulated under that scheme, or there will be a means by which the officer can ascertain that the vehicle is one subject to a regulatory inspection before the officer actually makes the stop.

### 2. <u>Leon</u>'s good-faith exception ordinarily will not apply to a warrantless administrative seizure and search

As we have previously discussed, the validity of a warrantless administrative search is premised on notice to members of the regulated class that they are subject to such a search. This notice actually takes the place of the warrant that would otherwise be required. <u>See</u> <u>Burger</u>, 482 U.S. at 703. In <u>Leon</u>, there was a facially valid warrant that was only later declared unconstitutional. In that case, both the officer and the party subject to the search thus had notice of the officer's apparent lawful authority to conduct that search. But here, that is not the case. Herrera never had any notice that a state trooper would have even facially valid authority to stop him to conduct a random administrative inspection. That is because Herrera was not in fact operating in a pervasively regulated

32

industry such that he could not "help but be aware" that he and his truck were subject to search. Burger, 482 U.S. at 703. For this reason, as well, we decline to apply Leon's good-faith exception so far afield from that exception's origin.

Nor is our conclusion contrary to this court's decision in Johnson. Johnson involved officers' interpreting the legal authority provided to them by a statutory regulatory scheme to conduct an administrative search. See 408 F.3d at 1323. Because the search in Johnson was premised on the officers' objectively reasonable interpretation of the relevant statutes authorizing the search, it would follow that the party subject to the search, also interpreting that statutory scheme in the same objectively reasonable manner, should have foreseen that that regulatory statute would subject him to such a warrantless administrative search. So, in permitting officers to rely on their own objectively reasonable interpretation of the regulatory statute in Johnson, we remain true to the general Fourth Amendment principles underlying a valid administrative search—that the person subject to the search have an objectively reasonable understanding that his engaging in a pervasively regulated business would subject him to a random warrantless administrative search.

By contrast, there is nothing in this record to suggest that Herrera objectively should have been on notice that his vehicle was subject to a warrantless administrative search. The fact of his vehicle's rated weight, which

33

he could be charged with knowing, actually negated the possibility that his vehicle was a commercial vehicle subject to a warrantless administrative stop. Because the very justification for allowing warrantless administrative searches is not present here, we do not believe it is appropriate under these circumstances to expand the regulatory search concept further by upholding an unauthorized administrative search because of the officer's mistaken good-faith factual belief (not shared by the person being searched) that the vehicle being searched was a commercial vehicle subject to an administrative search.

## D.    Conclusion

There are, admittedly, several Fourth Amendment principles that are in tension in this case.  First, Leon recognizes that the exclusionary rule is a prophylactic doctrine designed to modify police conduct that is not objectively reasonable.  That suggests that so long as officers are acting in an objectively reasonable manner, a court should not exclude evidence obtained contrary to the Fourth Amendment because to do so would not have the desired deterrent effect. But here, previous Tenth Circuit authority (Selsar) precludes a search for the purpose of determining whether a vehicle is in fact covered by Kansas's regulatory statutes authorizing an administrative search.  Excluding the evidence obtained as a result of this unauthorized administrative search will have the beneficial effect of requiring police officers to determine in advance whether a

34

vehicle is in fact a rated commercial vehicle before executing an administrative stop.

Further, the validity of such a warrantless administrative search under the Fourth Amendment is premised on clear notice to those subject to such a search. Applying Leon in the context of an unconstitutional regulatory search based upon just the officer's reasonable factual mistake would go beyond the underlying justification for deeming such a regulatory search valid under the Fourth Amendment—that the person engaging in a pervasively regulated business is aware of and accepts the burdens of a random warrantless administrative search or seizure. Under these circumstances, we determine that we are most faithful to the Fourth Amendment and to the doctrine of the regulatory search exception to the warrant requirement if we conclude that this search and seizure are constitutionally infirm and exclude the fruits of the search and seizure.

## III. CONCLUSION

For the foregoing reasons, we conclude that stopping Herrera to effect a random inspection of commercial vehicles violated Herrera's Fourth Amendment rights because Herrera's vehicle was not a commercial vehicle subject to random inspection under Kansas law. Further, we decline to apply Leon's good-faith exception to the application of the exclusionary rule under the facts of this case. Therefore, the evidence discovered during that unconstitutional seizure must be

suppressed. We thus REMAND this case to the district court with directions to VACATE Herrera's conviction and for such further proceedings as are consistent with this Opinion.